JEFFREY T. WEBBER, PETITIONER *v*. COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket No. 14336–11.                 Filed June 30, 2015.

P, a U.S. citizen, established a grantor trust that purchased "private placement" variable life insurance policies insuring the lives of two elderly relatives. P and various family members were the beneficiaries of these policies. The premiums paid for the policies, less various expenses, were placed in separate accounts whose assets inured exclusively to the benefit of the policies. The money in the separate accounts was used to purchase investments in startup companies with which P was intimately familiar and in which he otherwise invested personally and through private-equity funds he managed. P effectively dictated both the companies in which the separate accounts would invest and all actions taken with respect to these investments. R concluded that P retained sufficient control and incidents of ownership over the assets in the separate accounts to be treated as their owner for Federal income tax purposes under the "investor control" doctrine. *See* Rev. Rul. 77–85, 1977–1 C.B. 12. The powers P retained included the power to direct investments; the power to vote shares and exercise other options with respect to these securities; the power to extract cash at will from the separate accounts; and the power in other ways to derive "effective benefit" from the investments in the separate accounts. *See Griffiths v. Helvering*, 308 U.S. 355, 358 (1939).

1. *Held*: The IRS revenue rulings enunciating the "investor control" doctrine are entitled to deference and weight under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

2. *Held*, *further*, P was the owner of the assets in the separate accounts for Federal income tax purposes and was taxable on the income earned on those assets during the taxable years in issue.

3. *Held*, *further*, P is not liable for the accuracy-related penalties under I.R.C. sec. 6662(a) because he relied in good faith on professional advice from competent tax professionals.

324

*Robert Steven Fink*, *Megan L. Brackney*, and *Joseph Septimus*, for petitioner.

*Steven Tillem*, *Shawna A. Early*, and *Casey R. Kroma*, for respondent.

LAUBER, *Judge*: Petitioner is a venture-capital investor and private-equity fund manager. He established a grantor trust that purchased "private placement" variable life insurance policies insuring the lives of two elderly relatives. These policies were purchased from Lighthouse Capital Insurance Co. (Lighthouse), a Cayman Islands company. Petitioner and various family members were the beneficiaries of these policies.

The premium paid for each policy, after deduction of a mortality risk premium and an administrative charge, was placed in a separate account underlying the policy. The assets in these separate accounts, and all income earned thereon, were segregated from the general assets and reserves of Lighthouse. These assets inured exclusively to the benefit of the two insurance policies.

The money in the separate accounts was used to purchase investments in startup companies with which petitioner was intimately familiar and in which he otherwise invested personally and through funds he managed. Petitioner effectively dictated both the companies in which the separate accounts would invest and all actions taken with respect to these investments. Petitioner expected the assets in the separate accounts to appreciate substantially, and they did.

Petitioner planned to achieve two tax benefits through this structure. First, he hoped that all income and capital gains realized on these investments, which he would otherwise have held personally, would escape current Federal income taxation because positioned beneath an insurance policy. Second, he expected that the ultimate payout from these investments, including all realized gains, would escape Federal income and estate taxation because payable as "life insurance proceeds."

Citing the "investor control" doctrine and other principles, the Internal Revenue Service (IRS or respondent) concluded that petitioner retained sufficient control and incidents of ownership over the assets in the separate accounts to be treated as their owner for Federal income tax purposes. Treating petitioner as having received the dividends,

interest, capital gains, and other income realized by the separate accounts, the IRS determined deficiencies in his Federal income tax of $507,230 and $148,588 and accuracy-related penalties under section 6662 of $101,446 and $29,718 for 2006 and 2007, respectively.[1] We will sustain in large part the deficiencies, but we conclude that petitioner is not liable for the penalties.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated by this reference. When he petitioned this Court, petitioner lived in California.

### *Petitioner's Background and Business Activities*

Petitioner received his bachelor's degree from Yale College and attended Stanford University's M.B.A. program. He left Stanford early to start a technology consulting firm, and he later founded and managed a series of private-equity partnerships that provided "seed capital" to startup companies. These partnerships were early-stage investors that generally endeavored to supply the "first money" to these entities. Separately, petitioner furnished consulting services to startup ventures through his own firm, R.B. Webber & Co. (Webber & Co.).

Each venture-capital partnership had a general partner that was itself a partnership. Petitioner was usually the managing director of the general partner. The venture-capital partnership offered limited partnership interests to sophisticated investors. These offerings were often oversubscribed.

As managing director, petitioner had the authority to make, and did make, investment decisions for the partnerships. To spread the risk of investing in new companies, petitioner often invested through syndicates. A syndicate is not a formal legal entity but a group of investors (individuals or funds) who seek to invest synergistically. Generally speaking,

---

[1] All statutory references are to the Internal Revenue Code (Code) as in effect for the tax years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

the syndicate's goal was to make early-stage investments in companies that would ultimately benefit from a "liquidity event" like an initial public offering (IPO) or direct acquisition.

Before investing in a startup company, petitioner performed due diligence. This included review of the company's budget, business plan, and cashflow model; his review also included analysis of its potential customers and competitors and the experience of its entrepreneurs. Because petitioner, through Webber & Co., provided consulting services to numerous startup companies, he had access to proprietary information about them. On the basis of all this information, petitioner decided whether to invest, or to recommend that one of his venture-capital partnerships invest, in a particular entity. Having made an early-stage investment, petitioner usually sought to find new investors for that company, so as to spread his risk, enhance the company's prospects, and move it closer to a "liquidity event."

Having supplied the "first money" to these startup ventures, petitioner and his partnerships were typically offered subsequent opportunities to invest in them. These opportunities are commonly called "pro-rata offerings." As additional rounds of equity financing are required, a pro-rata offering gives a current equity owner the chance to buy additional equity in an amount proportionate to his existing equity. This enables him to maintain his current position and avoid "dilution" by new investors. Depending on the circumstances, petitioner would accept or decline these pro-rata offerings.

Petitioner invested in startup companies in various ways. He held certain investments in his own name; he invested through trusts and individual retirement accounts (IRAs); and he invested through the venture-capital partnerships that he managed. To help him manage this array of investments, petitioner in 1999 hired Susan Chang as his personal accountant. She had numerous and diverse responsibilities. These included determining whether petitioner had funds available for a particular investment; ensuring that funds were properly transferred and received; communicating with lawyers, advisers, paralegals, and others about investments in which petitioner was interested; and maintaining account balances and financial statements for petitioner's personal investments.

Because of his expertise, knowledge of technology, and status as managing director of private-equity partnerships, petitioner served as a member of the board of directors for more than 100 companies. As relevant to this opinion, petitioner through various entities invested in, and served on the boards of, the following companies at various times prior to December 31, 2007:

| Company name | Board member or officer | Petitioner individually or through a private equity partnership invested in | Petitioner through an IRA invested in |
|---|---|---|---|
| Accept Software | Yes | Yes | Yes |
| Attensity Corp. | Yes | Yes | No |
| Borderware Tech. | Yes | Yes | Yes |
| DTL Plum Investments | No | Yes | No |
| JackNyfe, Inc. | Yes | Yes | No |
| Lignup, Inc. | Yes | Yes | Yes |
| Links Mark Multimedia | No | Yes | No |
| Lunamira, Inc. | No | Yes | No |
| Medstory, Inc. | No | Yes | No |
| Milphworld, Inc. | No | Yes | No |
| Nextalk, Inc. | Yes | Yes | No |
| Prevarex, Inc. | Yes | Yes | No |
| Promoter Neurosciences | No | Yes | No |
| PTRx Media, LLC | Yes | Yes | Yes |
| Push Media, LLC | No | Yes | No |
| RJ Research, Inc. | No | Yes | No |
| Reactrix Systems, Inc. | No | Yes | No |
| Renaissance 2.0 Media | No | Yes | No |
| Signature Investments, RBN, Inc. | No | Yes | No |
| Soasta, Inc. | Yes | Yes | Yes |
| Techtribenetworks, Inc. | Yes | Yes | No |
| Vizible Corp. | Yes | Yes | Yes |
| WellDunn Restaurant Grp. | No | Yes | Yes |
| Webify Solutions | Yes | Yes | No |

*Petitioner's Tax and Estate Planning*

By 1998 petitioner had enjoyed success in his investing career and accumulated assets in excess of $20 million. An attorney named David Herbst, who furnished petitioner with tax advice, recommended that he secure the assistance of an experienced estate planner. One of petitioner's college classmates referred him to William Lipkind, a partner in the law firm Lampf, Lipkind, Prupis and Petigrow.

Petitioner met with Mr. Lipkind for the first time in 1998 at Mr. Herbst's office. Mr. Lipkind laid out a complex estate plan that involved a grantor trust and the purchase of private placement life insurance policies from Lighthouse. He explained that private placement insurance is a type of variable life insurance that builds value in a separate account. (The details of this strategy are discussed more fully below.)

Mr. Lipkind acknowledged that this tax-minimization strategy had certain tax risks, but he orally assured petitioner that the strategy was sound. After several followup conversations, petitioner hired Mr. Lipkind to do his estate planning and stated his intention to purchase the private placement life insurance. Mr. Lipkind then undertook a series of steps to implement this strategy.

*The Grantor Trusts*

The first step was the creation of a grantor trust, which had three iterations between 1999 and 2008. On March 24, 1999, petitioner established the Jeffrey T. Webber 1999 Alaska Trust (Alaska Trust), a grantor trust for Federal income tax purposes. Mr. Lipkind recommended Alaska as the situs in part because that State has no income tax; he was concerned that certain tax risks could arise if the trust were formed in California, where petitioner resided. Mr. Lipkind's firm drafted the trust documents and customized them to petitioner's needs.

The trustees of the Alaska Trust were Mr. Lipkind and the Alaska Trust Co. Petitioner could remove the trustees at any time and replace them with "Independent Trustees."[2] The beneficiaries were petitioner's children, his brother, and his brother's children. Petitioner was named a discretionary beneficiary of the Alaska Trust, which was necessary to achieve grantor trust status.[3]

In 1999 petitioner contributed $700,000 to the Alaska Trust. The trustee used these funds to purchase from Lighthouse two "Flexible Premium Restricted Lifetime Benefit Variable Life Insurance Policies" (Policy or Policies). Petitioner timely filed Form 709, United States Gift (and Genera-

---

[2] Independent Trustees could include any bank or an attorney who was not "within the meaning of section 672(c) * * * related or subordinate to the Grantor."

[3] The Alaska Trust provided that "any one Independent Trustee acting alone" may distribute to petitioner as Grantor "such amounts of the net income and/or principal * * * as such Independent Trustee deems wise." In determining whether to make any such distribution, the trustee was required to take into consideration "the Grantor's own income and property and any other income or property which may be available to the Grantor." The trustee was empowered to exercise such discretion without regard to the interest of remaindermen.

tion-Skipping Transfer) Tax Return, reporting this $700,000 gift. He attached to this return a disclosure statement explaining that the Alaska Trust "purchased two variable life insurance policies * * * for an aggregate first year's premium of $700,000" and noting that his "contributions to the Trust were completed gifts and the Trust assets will not be includible in [his] gross estate."

The Alaska Trust was listed as the owner of the Policies from October 28, 1999, to October 8, 2003. During 2003 petitioner became concerned about protecting his assets from creditors because Webber & Co. was encountering financial problems, he was going through a divorce, and he feared lawsuits from unhappy private-equity investors following the "dot.com" crash. With the goal of achieving asset protection, petitioner asked Mr. Lipkind to move the Alaska Trust assets offshore. Mr. Lipkind advised against doing this because of the tax disadvantages it could entail. Petitioner nevertheless persisted in his desire for asset protection, and Mr. Lipkind complied with his wishes.

On October 9, 2003, Mr. Lipkind established the Chalk Hill Trust, a foreign grantor trust organized under the laws of the Commonwealth of the Bahamas. The Alaska Trust then assigned all of its assets, including the Policies, to the Chalk Hill Trust. Petitioner filed a timely Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts, reporting this transfer and signing the return as "owner-beneficiary" of the Chalk Hill Trust.

Petitioner was the grantor of the Chalk Hill Trust and is treated as its owner for Federal income tax purposes. The trustee was Oceanic Bank & Trust, Ltd.; the U.S. protector was Mr. Lipkind; and the foreign protector was an entity from the Isle of Man. Petitioner and his issue were the beneficiaries of the Chalk Hill Trust. During petitioner's lifetime the trustee had "uncontrolled discretion" to distribute trust assets to the beneficiaries. Mr. Lipkind, as the U.S. protector, could remove and replace the trustee at any time.

The Chalk Hill Trust was listed as the owner of the Policies from October 9, 2003, through March 6, 2008. It was thus the nominal owner of the Policies during the tax years in issue. In early 2008 petitioner became confident that the credit risks had passed and decided to move the trust assets

back to a domestic grantor trust. The Delaware Trust was established for that purpose, and all assets of the Chalk Hill Trust, including the Policies, were assigned to it. The salient terms of the Delaware Trust arrangement did not differ materially from the terms of the prior two grantor trust arrangements. We will sometimes refer to the Alaska Trust, the Chalk Hill Trust, and the Delaware Trust collectively as "the Trusts."

*Lighthouse*

Lighthouse is a Cayman Islands class B unlimited life insurance company established in 1996 and regulated by the Cayman Islands Monetary Authority. Lighthouse issues annuity and variable life insurance products. During 1999 it issued 70 to 100 policies with a total outstanding face value of $250 to $300 million. Petitioner had no direct or indirect ownership interest in Lighthouse.

Lighthouse is managed by Aon Insurance Managers (Aon), a wholly owned subsidiary of Aon PLC, a major insurance company headquartered in London. Aon was responsible for the day-to-day operations of Lighthouse, including its record-keeping, compliance, and financial audits. Lighthouse reinsures mortality risk arising under its policies with Hannover Rückversicherung-AG (Hannover Re), a well-respected reinsurer. Lighthouse generally reinsures all but $10,000 of the mortality risk on each policy, as it did with these Policies. For some elderly insureds, such as those under petitioner's Policies, Lighthouse reinsured virtually 100% of the mortality risk.

Before issuing a policy Lighthouse would conduct an underwriting analysis and seek medical information about the prospective insured. Where (as here) the policyholder was not the insured, Lighthouse performed due diligence regarding the source of funds. It also confirmed the existence of an insurable interest.

*The Policies*

The Policies, initially acquired by the Alaska Trust and later transferred to the Chalk Hill Trust, insured the lives of two of petitioner's relatives. The first Policy insured the life of Mabel Jordan, the stepgrandmother of petitioner's then

wife. Ms. Jordan, who was 78 years old when the Policy was issued, died in November 2012 at age 92. The second Policy insured the life of Oleta Sublette, petitioner's aunt. She was 77 years old when the Policy was issued and was still alive at the time of trial. Each Policy had a minimum guaranteed death benefit of $2,720,000.

Each Policy required Lighthouse to establish a separate account pursuant to section 7(6)(c) of the Cayman Islands Insurance Law to fund benefits under that Policy. On receiving the initial premiums in 1999, Lighthouse debited against them the first-year policy charges (a one-year mortality risk premium and one year's worth of administrative fees). Lighthouse kept the administrative fees and transferred most of the mortality risk premium to Hannover Re. The remainder of each premium was allocated to the relevant separate account. On an annual basis thereafter, Lighthouse debited each separate account for that year's mortality and administrative charges. If the assets in the separate account were insufficient to defray these charges, the policyholder had to make an additional premium payment to cover the difference; otherwise, the policy would lapse and terminate.

The annual administrative fee that Lighthouse charged each Policy equaled 1.25% of its separate account value. There was an additional fee to cover services nominally provided by the Policies' "investment manager." (As explained below, that fee was modest.) The mortality risk charge was determined actuarially, but it rapidly decreased as the value of the separate accounts approached or exceeded the minimum death benefit of $2,720,000. The mortality risk charges debited to the separate accounts during 2006–2007 totaled $12,327.

The minimum death benefit was payable in all events so long as the Policy remained in force. If the investments in the separate account performed well, the beneficiary upon the insured's death was to receive the greater of the minimum death benefit or the value of the separate account. The Policies provided that the death benefit would be paid by Lighthouse "in cash to the extent of liquid assets and in kind to the extent of illiquid assets (any in kind payment being in the sole discretion of Lighthouse), or the Death Benefit shall be paid by such other arrangements as may be agreed upon."

The Policies permitted the policyholder to add additional premiums if necessary to keep the Policies in force. On September 7, 2000, the Alaska Trust made an additional premium payment of $35,046 to cover a portion of the second-year mortality/administrative charge. The assets in the separate accounts performed so well that no subsequent premium payments were required. Thus, the total premiums paid on the Policies by the Alaska Trust (and by its successor grantor trusts) amounted to $735,046.

The Policies granted certain rights to the policyholder prior to the deaths of the insureds. Each Policy permitted the policyholder to assign it; to use it as collateral for a loan; to borrow against it; and to surrender it. If the policyholder wished to assign a Policy or use it as collateral for a loan, Lighthouse had the discretion to reject such a request.

However, the Policies significantly restricted the amount of cash the policyholder could extract from the Policies by surrender or policy loan. This restriction was accomplished by limiting the Cash Surrender Value of each Policy to the total premiums paid, and by capping any policy loan at the Cash Surrender Value. For this purpose, "premiums" were defined as premiums paid in cash by the policyholder, to the exclusion of mortality/administrative charges debited from the separate accounts.

Thus, if the separate accounts performed poorly and the policyholder paid cash to cover ongoing mortality/administrative charges, those amounts would constitute "premiums" and would increase the Cash Surrender Value. By contrast, if the separate accounts performed well and ongoing mortality/administrative charges were debited from the separate accounts, those amounts were not treated as premiums that increased the Cash Surrender Value, but as internal charges paid by Lighthouse. [4] The result of this restriction was that the maximum amount the Trusts could extract from the Policies prior to the deaths of the insureds, by surrendering the Policies or taking out policy loans, was $735,046.

---

[4] For 2006 and 2007 the separate accounts paid Lighthouse $130,000 and $161,500, respectively, to cover annual mortality/administrative charges. The 2007 charges were higher because the separate accounts' values had increased.

*Investment Management of the Separate Accounts*

Lighthouse did not provide investment management services for the separate accounts. Rather, it permitted the policyholder to select an investment manager from a Lighthouse-approved list. For most of 2006 and 2007 Butterfield Private Bank (Butterfield), a Bahamian bank, served as the investment manager for the separate accounts. The Policies specified that Butterfield would be paid $500 annually for investment management services and $2,000 for accounting.[5] In November 2007 Experta Trust Co. (Bahamas), Ltd. (Experta), became the investment manager. No one testified at trial on behalf of Butterfield or Experta. We will refer to these entities collectively as the "Investment Manager."

As drafted, the Policies state that no one but the Investment Manager may direct investments and deny the policyholder any "right to require Lighthouse to acquire a particular investment" for a separate account. Under the Policies, the policyholder was allowed to transmit "general investment objectives and guidelines" to the Investment Manager, who was supposed to build a portfolio within those parameters. The Trusts specified that 100% of the assets in the separate accounts could consist of "high risk" investments, including private-equity and venture-capital assets. Lighthouse was required to perform "know your client" due diligence, designed to avoid violation of antiterrorism and moneylaundering laws, and was supposed to ensure that "the Separate Account investments [were managed] in compliance with the diversification requirements of Code Section 817(h)."

Besides setting the overall investment strategy for a separate account, a policyholder was permitted to offer specific investment recommendations to the Investment Manager. But the Investment Manager was nominally free to ignore such recommendations and was supposed to conduct independent due diligence before investing in any nonpublicly traded security. Although almost all of the investments in

---

[5] It appears that the separate accounts paid Butterfield $8,500 in overall fees for 2006 and 2007, but there is no evidence that any amount in excess of $500 per year was allocable to investment management. Petitioner directs the Court's attention to an accounting entry showing "Administrative Fees" of $20,500 paid in 2007, but there is no evidence to establish what these were paid for.

the Policies' separate accounts consisted of nonpublicly traded securities, the record contains no compliance records, financial records, or business documentation (apart from boilerplate references in emails) to establish that Lighthouse or the Investment Manager in fact performed independent research or meaningful due diligence with respect to any of petitioner's investment directives.

Lighthouse created a series of special-purpose companies to hold the investments in the separate accounts. The Lighthouse Nineteen Ninety-Nine Fund LDC (1999 Fund), organized in the Bahamas, was created when the separate accounts were initially established. During the tax years in issue the principal special-purpose company was Boiler Riffle Investments, Ltd. (Boiler Riffle), likewise organized in the Bahamas. These investment funds were owned by Lighthouse but were dedicated exclusively to funding death benefits under the Policies through the separate accounts. These special-purpose vehicles were not available to the general public or to any other Lighthouse policyholder.

*The "Lipkind Protocol"*

Mr. Lipkind explained to petitioner that it was important for tax reasons that petitioner not appear to exercise any control over the investments that Lighthouse, through the special-purpose companies, purchased for the separate accounts. Accordingly, when selecting investments for the separate accounts, petitioner followed the "Lipkind protocol." This meant that petitioner never communicated—by email, telephone, or otherwise—directly with Lighthouse or the Investment Manager. Instead, petitioner relayed all of his directives, invariably styled "recommendations," through Mr. Lipkind or Ms. Chang.

The record includes more than 70,000 emails to or from Mr. Lipkind, Ms. Chang, the Investment Manager, and/or Lighthouse concerning petitioner's "recommendations" for investments by the separate accounts. Mr. Lipkind also appears to have given instructions regularly by telephone. Explaining his lack of surprise at finding no emails about a particular investment, Mr. Lipkind told petitioner: "We have relied primarily on telephone communications, not written

paper trails (you recall our 'owner control' conversations)." The 70,000 emails thus tell much, but not all, of the story.

*Investments by the Separate Accounts*

In April 1999, shortly after the Alaska Trust initiated the Policies, the 1999 Fund purchased from petitioner, for $2,240,000, stock that petitioner owned in three startup companies: Sagent Technology, Inc., Persistence Software, Inc., and Commerce One, Inc. Petitioner was unsure how the 1999 Fund could have paid him $2,240,000 for his stock when the Alaska Trust at that point had paid premiums toward the Policies of only $700,000 (before reduction for very substantial first-year mortality charges). He speculated that he might have made an installment sale.

Petitioner testified that he expected the stock in these three companies to "explode" in value. They did. Not long thereafter, each company had a "liquidity event"—either an IPO or direct sale—that enabled the separate accounts to sell the shares at a substantial gain. Those profits were used to purchase other investments for the separate accounts during the ensuing years.

During 2006–2007 Boiler Riffle was the special-purpose entity through which petitioner effected most of his investment objectives for the Policies.[6] (In their email correspondence, petitioner and Mr. Lipkind often refer to Boiler Riffle as "BR" or "br," and various parties refer to petitioner as "Jeff.") Petitioner achieved his investment objectives by entering into transactions directly with Boiler Riffle and by offering through his intermediaries "recommendations" about assets in which Boiler Riffle should invest.

The net result of this process was that every investment Boiler Riffle made was an investment that petitioner had "recommended." Apart from certain brokerage funds, virtually every security that Boiler Riffle held was issued by a startup company in which petitioner had a personal financial interest, e.g., by sitting on its board, by investing in its secu-

---

[6] Boiler Riffle had 5,000 shares of stock outstanding, and its Register of Members showed 2,500 shares as "owned" by each Policy. Since an insurance policy cannot own property, the Court interprets this reference to mean that half of the assets held by Boiler Riffle were dedicated respectively to each Policy.

rities personally or through an IRA, or by investing in its securities through a venture-capital fund he managed. The Investment Manager did no independent research about these fledgling companies; it never finalized an investment until Mr. Lipkind had signed off; and it performed no due diligence apart from boilerplate requests for organizational documents and "know your customer" review. The Investment Manager did not initiate or consider any equity investment for the separate accounts other than the investments that petitioner "recommended." The Investment Manager was paid $500 annually for its services, and its compensation was commensurate with its efforts.

The 70,000 emails in the record establish that Mr. Lipkind and Ms. Chang served as conduits for the delivery of instructions from petitioner to Lighthouse and Boiler Riffle. The fact that Boiler Riffle invested almost exclusively in startup companies in which petitioner had a personal financial interest was not serendipitous but resulted from petitioner's active management over these investments. The following table shows the startup companies in which Boiler Riffle held investments at yearend 2006 and 2007, the form of those investments, and whether petitioner invested in the same entities outside of the Policies:

| Company | Equity | Convertible debt/ promissory note | Petitioner invested in outside policies |
|---|---|---|---|
| Accept Software | 2006 & 2007 | 2007 | Yes |
| Attensity Corp. | 2006 & 2007 | --- | Yes |
| Borderware Tech. | 2006 & 2007 | 2006 & 2007 | Yes |
| DTL Plum Investments | 2006 & 2007 | --- | Yes |
| JackNyfe, Inc. | 2007 | --- | Yes |
| Lignup, Inc. | 2006 & 2007 | 2007 | Yes |
| Links Mark Multimedia | --- | 2007 | Yes |
| Lunamira, Inc. | 2007 | --- | Yes |
| Medstory | 2006 | --- | Yes |
| Milphworld, Inc. | --- | 2007 | Yes |
| Nextalk, Inc. | 2007 | --- | Yes |
| Prevarex, Inc. | 2007 | --- | Yes |
| Promoter Neurosciences | 2007 | --- | Yes |
| PTRx Media, LLC | 2006 & 2007 | 2007 | Yes |
| Quintana Energy | 2006 & 2007 | --- | Yes |
| Push Media, LLC | 2006 & 2007 | --- | Yes |
| RJ Research, Inc. | --- | 2007 | Yes |
| Reactrix Systems, Inc. | 2006 & 2007 | --- | Yes |
| Renaissance 2.0 Media | 2006 & 2007 | --- | Yes |
| Signature Investments, RBN, Inc. | --- | 2006 & 2007 | Yes |
| Soasta, Inc. | 2007 | --- | Yes |
| Techtribenetworks, Inc. | 2006 & 2007 | 2006 & 2007 | Yes |
| Vizible Corp. | 2006 & 2007 | --- | Yes |
| WellDunn Restaurant Grp. | 2006 & 2007 | --- | Yes |

Though Mr. Lipkind was careful to insulate petitioner from direct communication with the Investment Manager, he frequently represented to the personnel of target investments that he and petitioner controlled Boiler Riffle and were acting on its behalf. Indeed, he often referred to Boiler Riffle as "Jeff's wallet." (Ms. Chang once suggested that the target companies change their email protocol "in order to maintain the appearance of separation.") "When Butterfield gets something with respect to Boiler Riffle," Mr. Lipkind told one target company, "they always solicit my views before doing anything." "While it [may] sound complex," he told another company, "the process does move quite rapidly. Besides, Butterfield will do nothing unless and until both I and Lighthouse sign off." We set forth below a representative sample of communications among Mr. Lipkind, Ms. Chang, Lighthouse, the Investment Manager, and the startup companies in which petitioner wished Boiler Riffle to invest.

*Accept Software*. Petitioner invested in Accept Software personally and through funds he managed and was a member of its board of directors. In January and June 2006 he communicated directly with its representatives, prior to any consultation with the Investment Manager, and committed to have Boiler Riffle purchase its series B equity round shares. Petitioner made a personal financial commitment to officers of Accept Software and then directed Boiler Riffle to finance that commitment. In December 2006 Mr. Lipkind emailed a staff person at Butterfield and informed her that petitioner wished to make this investment: "It is most strongly recommended that BR go forward with this. If there are any questions, please call." The Investment Manager duly complied with this recommendation.

In mid-2007 Accept Software offered its shareholders a chance to participate in a bridge financing. Petitioner initially indicated that he wished Boiler Riffle to participate for its "pro-rata amount," and this instruction was relayed to the Investment Manager. Later, Mr. Lipkind thought petitioner had changed his mind and emailed a staff person at Butterfield: "An issue has now arisen with respect to going as high as 'pro-rata.' Have papers been sent in? If not, hold. I should get matter cleared up by tomorrow. If papers went in already, I will deal with it at Company level." The staff person responded: "I have not sent the paper work as yet

[and] I will hold until I h[ear] f[rom] you." Petitioner ultimately decided to take his pro-rata share, and Boiler Riffle obediently made that investment.

*PTRx Media*. Petitioner invested in PTRx personally and through funds he managed and was a member of its board of directors. In March 2006 petitioner told Mr. Lipkind that he wanted Boiler Riffle to invest $50,000 in PTRx's series B financing. On March 31, 2006, Mr. Lipkind emailed Ms. Strachan of Butterfield as follows: "Boiler Riffle should participate in the attachments for Series B to the tune of $50,000, the same amount it did on Series A. I assume you will process same." Boiler Riffle purchased the PTRx stock.

PTRx later offered a series D financing, and Mr. Lipkind asked petitioner whether Boiler Riffle should participate. Petitioner responded: "[PTRx is] doing great [and] they should be break even by the end of the year. They have just hired a killer sales guy. We cut a great deal this morning with a bank. * * * I would do pro-rata at the minimum." Mr. Lipkind emailed the Investment Manager and "strongly recommended that Boiler Riffle * * * participate at least to their pro-rata." Boiler Riffle duly purchased its pro-rata share of the series D financing.

*WellDunn Restaurant Group*. Petitioner invested in WellDunn personally and through a fund he managed. On September 1, 2006, Mr. Lipkind emailed Ms. Strachan at Butterfield as follows: "We recommend WellDunn as an investment for Boiler Riffle. WellDunn had hoped that BR would invest $250,000, but I advised them it was unlikely that the investment would exceed $150,000. Until they indicate that is OK, it is unnecessary to proceed."

WellDunn subsequently acquiesced in the reduced investment amount and Mr. Lipkind sent a followup email to Ms. Strachan: "Please proceed with BR investing $150,000 in this deal." Mr. Lipkind then informed his contact at WellDunn: "I have * * * instructed Kimberly to proceed and to deal directly with you. BR's investment should now proceed quickly and smoothly." On September 13, 2006, Boiler Riffle invested $150,000 in WellDunn.

*JackNyfe, Inc.* Petitioner invested in JackNyfe personally and through a fund he managed and was on its board of directors. On August 27, 2007, petitioner informed Mr. Lipkind that he had structured a $1.2 million financing for

JackNyfe that would be effected in $200,000 tranches. He told Mr. Lipkind that "the participants in these financings will be br and others. * * * br should consider to be on point for the first $400,000." On September 6, 2007, Ms. Chang sent Mr. Lipkind wire instructions that Boiler Riffle was to use when making its initial $200,000 investment.

Mr. Lipkind forwarded these wire instructions to a staff person at Butterfield but noted: "I am still reviewing certain documents so that I have not given a green light recommendation yet." On September 10, 2007, Mr. Lipkind completed his document review and emailed the Investment Manager with instructions that "we proceed." On September 18, 2007, Mr. Lipkind sent a followup email instructing the Investment Manager to get the investment in JackNyfe done "ASAP" because "Jeff wanted to close this tranche as soon as possible." Boiler Riffle followed Mr. Lipkind's instructions and invested $200,000 in JackNyfe.

*Lignup, Inc.* Petitioner invested in Lignup personally and through a fund he managed and was on its board of directors. On December 16, 2005, without approval from the Investment Manager, petitioner committed to Lignup's representatives that Boiler Riffle would invest $300,000 in the company. In late December 2005 Mr. Lipkind followed up with a "recommendation" to the Investment Manager. Boiler Riffle made the desired investment in the desired amount.

After instructing Boiler Riffle to invest in Lignup, petitioner directed what actions Boiler Riffle should take in its capacity as a Lignup shareholder. On May 19, 2006, Mr. Lipkind relayed petitioner's instructions that Boiler Riffle consent to an amendment of Lignup's certificate of incorporation, but that it reject participation in a subsequent financing round. Mr. Lipkind told the Investment Manager to "[k]indly process" petitioner's instructions, and it did so.

As a shareholder in his own right, petitioner had the opportunity to subscribe for pro-rata offerings of Lignup shares, but on certain occasions he assigned his rights to Boiler Riffle. On June 1, 2006, Ms. Chang told Mr. Lipkind that "Jeff would like Boiler Riffle to take his pro rata of 74,743 shares of Lignup Series B stock." Mr. Lipkind passed this recommendation on to the Investment Manager, and Boiler Riffle purchased the shares. Six months later, Mr. Lipkind noted that "Jeff in all of his incarnations" would

take his pro-rata share of a subsequent Lignup offering and would assign part of his share to Boiler Riffle. Mr. Lipkind said, "Full speed ahead on this one," and a staff person from Butterfield replied that this could "get done next week."

*Techtribenetworks, Inc.* Petitioner invested in Techtribenetworks personally and through funds he managed and was on its board of directors. In early 2006 he lent the company $50,000 in exchange for a promissory note. Later that year he sold that promissory note to Boiler Riffle for $50,000. In early 2007 petitioner advanced an additional $200,000 to Techtribenetworks. At petitioner's request, Boiler Riffle then lent Techtribenetworks $200,000 so that it could reimburse petitioner for the funds he had invested several months previously.

The $200,000 note Boiler Riffle received from Techtribenetworks was convertible into its series B stock. When a "B" financing round was announced later in 2007, Mr. Lipkind instructed Boiler Riffle to invest $250,000. A staff person from Butterfield asked whether Boiler Riffle should convert the $200,000 note and add $50,000 in cash, or whether it should invest $250,000 of new money on top of the note. Mr. Lipkind directed that Boiler Riffle do the former, and it did.

*Quintana Energy.* On September 19, 2006, Mr. Lipkind emailed a representative of Quintana Energy stating: "Our entity, Boiler Riffle, a Bahamian corporation, would like to invest an aggregate of $600,000. In addition, Jeff's IRA would like to invest $200,000." The following week, Mr. Lipkind emailed that individual and others stating: "For very important reasons, please do not, in any communication with me concerning Quintana and Boiler Riffle, include Jeff Webber as a copy." On September 22, 2006, Boiler Riffle made a substantial investment in Quintana Energy.

In January 2007 Quintana Energy issued a capital call to its shareholders. On January 22, 2007, a Butterfield staff person emailed Mr. Lipkind asking him to "confirm whether Boiler Riffle is interested in the Quintana capital call for Jan. 30th." Mr. Lipkind responded, "Yes. BR should honor the capital call." Boiler Riffle evidently did so.

*Signature Investments RBN, Inc.* In 2006 petitioner wanted Boiler Riffle to invest $500,000 in Longboard Vineyards, LLC (Longboard), a California winery. (Petitioner had previously owned a winery himself.) He began negotiations directly with

Longboard without consulting the Investment Manager. Because Longboard was a pass-through entity for Federal income tax purposes, Mr. Lipkind advised petitioner that "it is tax inefficient for it to be owned by Boiler Riffle."

On Mr. Lipkind's advice, petitioner accordingly organized Signature Investments RBN, Inc. (Signature), a domestic C corporation of which he was the president and beneficial owner, and capitalized it with $50,000 of his own funds. Petitioner then made arrangements for Boiler Riffle to lend $450,000 to Signature, with the plan that Signature would then lend $500,000 to Longboard. Longboard was experiencing financial difficulty at this time, but petitioner assured Mr. Lipkind that the loan from Signature "brings everything in compliance" and "the bank is in the loop."

Petitioner's personal attorneys reviewed the operating agreement for Longboard, made comments on it, and worked with Longboard's representatives to draft the promissory note. During these negotiations petitioner asked that the note from Longboard to Signature act as security for the note from Signature to Boiler Riffle. Longboard's representative told Mr. Lipkind that "this would probably be okay if Boiler is owned or controlled by Webber." Mr. Lipkind responded: "Boiler Riffle is 100% owned by two variable life insurance policies * * * both of which are owned by a Trust of which Jeff [Webber] is the Settlor and a discretionary beneficiary." This explanation satisfied Longboard.

After getting Longboard's signoff on the security agreement, Mr. Lipkind instructed his associate to send the draft promissory note to the Investment Manager "explaining the transaction which is contemplated and 'recommend' and seek their approval both for the loan and the form of the note. Thereafter, please coordinate * * * to get this thing done." On November 11, 2006, Boiler Riffle lent Signature $450,000 in exchange for its note, and on December 18, 2006, Signature lent Longboard $500,000 in exchange for its note. Longboard's note to Signature was subordinated to the winery's outstanding bank loans.

Boiler Riffle made two additional loans to Signature the following year. In September 2007 Longboard required more capital, and petitioner arranged a $100,000 loan from Boiler Riffle through Signature to the winery. Ms. Chang asked Mr. Lipkind "to request that Boiler Riffle proceed with its consid-

eration of a $100,000 advance to Signature." As soon as Mr. Lipkind's staff drafted the note and petitioner had signed it, Ms. Chang requested that it "be presented to Boiler Riffle to fund along with wire instructions." Boiler Riffle promptly complied.

Later that month Boiler Riffle lent Signature another $80,000. As Ms. Chang explained to Mr. Lipkind, this loan had nothing to do with the winery: "Jeff needs to borrow from Boiler Riffle $80,000 as soon as possible for a deposit on the Canada Maximas lodge, to be purchased through Wild Goose Investments." Boiler Riffle promptly complied.

*Philtap Holdings, Ltd.* In April 2006 petitioner wanted to invest in Post Ranch Investments Limited Partnership (Post Ranch), which was developing a luxury property in Big Sur, California. Without prior approval from the Investment Manager, petitioner began negotiations directly with Post Ranch's representatives. On April 4, 2006, Ms. Chang informed Mr. Lipkind of the status: "Jeff wants to invest in an LP that will be a part owner of a luxury resort in Big Sur * * *. We thought Jeff could purchase 250K interest through his IRA, but there are a number of hurdles. * * * Would you * * * be able to make such an investment happen by early next week?" She later followed up: "Since [Jeff] insists on making this investment and it is not a wise use of onshore dollars at this time given existing capital commitments and the bank's liquidity requirements, he is looking towards Boiler Riffle."

After reviewing Post Ranch's offering materials, Mr. Lipkind advised petitioner against making this investment: "When one adds up the various and conflicting roles of the promoters, one concludes there is virtually no way in law to protect oneself adequately. Thus, you are giving your money to these promoters and praying to God that they treat their LPs fairly." Although Mr. Lipkind warned that "a reasonably prudent investor with no personal knowledge or relationship with the promoters would take a pass," petitioner decided to invest anyway.

Mr. Lipkind then passed petitioner's "recommendation" on to the Investment Manager. He was told that Boiler Riffle had $250,000 available but that Lighthouse preferred to have the investment made by an entity other than Boiler Riffle. Mr. Lipkind then instructed the Investment Manager to form

a new entity "ASAP" to complete the deal. The Investment Manager followed Mr. Lipkind's instruction and set up a new company, Philtap Holdings, Ltd. (Philtap), which was owned by Lighthouse. On April 19, 2006, Philtap invested $250,000 in Post Ranch as petitioner had instructed.

*Webify Solutions*. Petitioner and two other investors provided the initial seed money to Webify Solutions (Webify), and petitioner served on its board of directors. In October 2002 Webify issued petitioner warrants to purchase 250,000 shares of its common stock for 5 cents per share. Petitioner wanted Boiler Riffle to acquire these warrants from him, and Mr. Lipkind conveyed this "recommendation" to the Investment Manager. On March 31, 2003, Boiler Riffle purchased the warrants from petitioner for $3,085. He reported this sale on a 2003 gift tax return, attaching an appraisal supporting the $3,085 value. In 2004 Boiler Riffle exercised the warrants and purchased 250,000 shares of Webify for $12,500.

Petitioner was aware that International Business Machines (IBM) might be interested in Webify, and he recommended that Boiler Riffle make additional Webify investments. In a series of transactions during 2002–2004, Boiler Riffle purchased $412,500 of Webify convertible debentures and entered into an agreement to purchase series B preferred stock for an amount in excess of $400,000. In July 2006 IBM agreed to purchase Boiler Riffle's aggregate investment in Webify for more than $3 million. Of this sum, $2,731,087 was paid in 2006, and the remainder was put into escrow to indemnify IBM against certain risks. An additional $212,641 was paid to Boiler Riffle from the escrow in 2007, and the remaining balance was apparently paid in 2008. As shown on Butterfield's financial records, Boiler Riffle's aggregate basis in its Webify investment was $838,575.

*Milphworld, Inc.* While acknowledging that Lighthouse implemented "the vast bulk" of his instructions, petitioner contends that it demurred to his recommendation to buy shares of Milphworld. This was supposedly because Lighthouse thought the company's name had a derogatory connotation. There is no documentary evidence of such reluctance, and Boiler Riffle in fact invested in Milphworld.

Petitioner initially suggested the Milphworld investment in August 2006, but SEC restrictions apparently prevented Boiler Riffle from acquiring its stock. To get around these

restrictions, petitioner made loans to Milphworld and arranged to have Boiler Riffle purchase its promissory notes from him. A staff person from the Investment Manager emailed Mr. Lipkind: "Kindly advise if we are to proceed with the Milphworld investment in Boiler Riffle." Mr. Lipkind responded, "[Y]es." In February 2007 Boiler Riffle purchased from petitioner six Milphworld promissory notes with an aggregate face value of $186,600.

*Lehman Brothers Fund.* Besides investing in startup companies that petitioner "recommended," Boiler Riffle placed funds in money-market and other investment vehicles offered by brokerage firms. Petitioner cites a Lehman Brothers fund as another of his recommendations that the Investment Manager supposedly rejected. There is no record support for this contention; in fact, the record establishes the opposite.

In May 2006, without prior approval from the Investment Manager, Mr. Lipkind emailed a broker at Lehman Brothers regarding that firm's Co-Investment Partners fund (CIP), inquiring how they might "splice this investment into an appropriate place in Jeff's universe." Two days later Mr. Lipkind emailed Butterfield, stating: "We recommend Boiler Riffle sign up for a $1,000,000 investment" in CIP. One week later, Mr. Lipkind emailed petitioner to confirm that Boiler Riffle had made this investment. Later in 2006 CIP issued a capital call. On November 7, 2006, Mr. Lipkind emailed Ms. Strachan: "This is a Jeff Webber/BR investment. I assume you will take care of the capital call." There is no evidence that the Investment Manager failed to do so. [7]

---

[7] Petitioner cites only one other occasion on which the Investment Manager allegedly declined to implement an investment recommendation that petitioner had made, concerning a company called Safeview. The Investment Manager apparently pointed out to petitioner a "due diligence" issue concerning this company—the State of California had issued a complaint against one of its principals—but petitioner himself made the final decision not to invest. On July 12, 2007, Mr. Lipkind accordingly emailed the Investment Manager: "I want Safeview Investment to be 'on hold' until I recommend further." Later in 2007 petitioner again suggested an investment in Safeview. The record contains no evidence that the Investment Manager opposed the investment at that time.

*Mr. Lipkind's Tax Advice*

After explaining the mechanics of private placement life insurance at their 1998 meeting, Mr. Lipkind noted that there were certain Federal tax risks associated with this tax-minimization strategy. He told petitioner that he had reviewed pertinent IRS rulings, relevant judicial precedent, and opinion letters from several U.S. law firms. These opinion letters, issued by Powell Goldstein, Rogers & Wells, and other firms, addressed the U.S. tax consequences of Lighthouse private placement life insurance products generally. James A. Walker, Jr., the author of the Powell Goldstein opinions, later became outside general counsel for Lighthouse. Mr. Lipkind had lengthy discussions with Mr. Walker about the Lighthouse products and the tax risks associated with them.

Three of these opinion letters specifically addressed the "investor control" doctrine. They stated that "investor control is a factual issue and uncertain legal area" but concluded that the Lighthouse policies as structured would comply with U.S. tax laws and avoid application of this doctrine. Mr. Lipkind told petitioner that he concurred in these opinions.

Acknowledging the risk that the IRS would challenge the strategy, Mr. Lipkind concluded that the "investor control" doctrine would not apply because petitioner would not be in "constructive receipt" of the assets held in the separate accounts. While assuring petitioner that the outside legal opinions supported this conclusion, Mr. Lipkind did not provide a written opinion himself. Mr. Herbst approved the Lighthouse transaction but did not provide a written opinion either.

For their work preparing Trust documents and all other work for petitioner, Mr. Lipkind and his colleagues charged time at their normal hourly rates. Neither Mr. Lipkind nor his firm received from petitioner any form of bonus or other remuneration apart from hourly time charges. Neither Mr. Lipkind nor his firm received compensation of any kind from Lighthouse or the Investment Manager.

*IRS Examination and Tax Court Proceedings*

The IRS examined petitioner's timely filed 2006 and 2007 Federal income tax returns. Initially, petitioner directed his

staff to produce all documents and other information that the IRS requested. He declined, however, to let the IRS interview Ms. Chang, and respondent therefore issued an administrative summons for her testimony. Petitioner's attorneys moved to quash this summons contending (among other things) that IRS personnel had made false statements about petitioner to third parties. IRS representatives eventually interviewed Ms. Chang.

After the examination the IRS advanced a variety of theories to support its determination that petitioner was taxable on the income that Boiler Riffle derived from the investments it held for the Polices' separate accounts. These theories included the contention that the Lighthouse structure lacked economic substance or was a "sham"; that Boiler Riffle was a "controlled foreign corporation" (CFC) whose income was taxable to petitioner under section 951 through the Chalk Hill Trust; and that petitioner should be deemed to own the assets in the separate accounts under the "investor control" doctrine. The parties have stipulated that Boiler Riffle had the following items of book income and expense during 2006 and 2007:

| Item | 2006 | 2007 |
|------|------|------|
| Realized gain | $1,913,237 | $28,379 |
| Unrealized gain | -0- | 82,562 |
| Unrealized loss | (21,555) | -0- |
| Dividends/interest | 78,595 | 214,799 |
| Loan interest | -0- | 210,741 |
| Miscellaneous/other income | 40 | 212,641 |
| Total income | 1,970,317 | 749,122 |
| Policy mortality/admin. charges | 130,000 | 161,500 |
| Bank service charges | 2,172 | 6,157 |
| Butterfield bank fees | 8,500 | -0- |
| Administration fees | -0- | 20,500 |
| Government fees and taxes | 350 | 1,871 |
| Miscellaneous/other expense | 1,163 | 454 |
| Total expense | 142,185 | 190,482 |
| Net income per books | 1,828,132 | 558,640 |

Boiler Riffle had total assets of $7.2 million and $12.3 million at the end of 2006 and 2007, respectively. The separate accounts appear to have held other assets, owned by Philtap or other special-purpose entities, but the record does not

reveal the amounts of those other assets. The IRS issued petitioner a notice of deficiency on March 22, 2011. He timely sought review in this Court.

OPINION

I. *Burden of Proof*

When contesting the determinations set forth in a notice of deficiency, the taxpayer generally bears the burden of proof. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). If a taxpayer introduces "credible evidence with respect to any factual issue," the burden of proof on that issue will shift to the Commissioner if certain conditions are met. Sec. 7491(a)(1). "Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted." *Higbee v. Commissioner*, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105–599, at 240–241 (1998), 1998–3 C.B. 747, 994–995). To qualify for a shift in the burden of proof, the taxpayer must (among other things) have "cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews." Sec. 7491(a)(2)(B). The taxpayer bears the burden of proving that all of these requirements have been satisfied. *See Rolfs v. Commissioner*, 135 T.C. 471, 483 (2010), *aff'd*, 668 F.3d 888 (7th Cir. 2012).

As explained *infra* p. 363, petitioner did not introduce "credible evidence" on the central factual issues in this case. Nor did he fully cooperate with respondent's reasonable discovery requests. He rejected respondent's request to interview Ms. Chang, forcing the IRS to issue a summons; when the summons was issued, petitioner's attorneys moved to quash it. An interview with Ms. Chang could reasonably have led, and did lead, to relevant evidence. *See Polone v. Commissioner*, T.C. Memo. 2003–339, *aff'd*, 479 F.3d 1019 (9th Cir. 2007). By seeking to block respondent's access to Ms. Chang, petitioner failed to "cooperate[ ] with reasonable requests by the Secretary for witnesses, * * *, meetings, and interviews." *See* sec. 7491(a)(2)(B); *see Rolfs*, 135 T.C. at 483. The burden of proof thus remains on him. [8]

_____

[8] In any event, whether the burden has shifted matters only in the case

II. *Tax Treatment of Life Insurance and Annuities*

The Policies in this case are a form of private-placement variable life insurance. Private-placement insurance is sold exclusively through a private-placement offering. These policies are marketed chiefly to high-net-worth individuals who qualify as accredited investors under the Securities Act of 1933. *See* 15 U.S.C. sec. 77b(a)(15) (2006); 17 C.F.R. sec. 230.501(a) (2006).

Variable life insurance is a form of cash value insurance. Under traditional cash value insurance, the insured typically pays a level premium during life and the beneficiary receives a fixed death benefit. Under a variable policy, both the premiums and the death benefit may fluctuate. The assets held for the benefit of the policy are placed in a "segregated asset account," that is, an account "segregated from the general asset accounts of the [insurance] company." Sec. 817(d)(1). The policy does not earn a fixed or predictable rate of return but a return dictated by the actual performance of the investments in this separate account.

If the assets in the separate account perform well, the premiums required to keep the policy in force may be reduced as the account buildup lessens the insurer's mortality risk. If those assets perform extremely well, as was true here, the value of the policy may substantially exceed the minimum death benefit. Upon the insured's death, the beneficiary receives the greater of the minimum death benefit or the value of the separate account.

Life insurance and annuities enjoy favorable tax treatment. Under section 72, earnings accruing to cash value and annuity policies—often referred to as the "inside buildup"—are not currently taxable to the policyholder (and generally are not taxable to the insurance company). The cash value of the policy thus grows more rapidly than that of a taxable

---

of an evidentiary tie. *See Polack v. Commissioner*, 366 F.3d 608, 613 (8th Cir. 2004), *aff'g* T.C. Memo. 2002–145. In this case, we discerned no evidentiary tie on any material issue of fact. *See Payne v. Commissioner*, T.C. Memo. 2003–90, 85 T.C.M. (CCH) 1073, 1077 ("Although assignment of the burden of proof is potentially relevant at the outset of any case, where * * * the Court finds that the undisputed facts favor one of the parties, the case is not determined on the basis of which party bore the burden of proof, and the assignment of burden of proof becomes irrelevant.").

investment portfolio. The policyholder may access this value, often on a tax-free basis, by withdrawals and policy loans during the insured's lifetime. *See* sec. 72(e). If the contract is held until the insured's death, the insurance proceeds generally are excluded from the beneficiary's income under section 101(a). With proper structuring, the death benefit will also be excluded from the estate tax. *See* sec. 2042. [9]

A variable contract based on a segregated asset account "shall not be treated as an annuity, endowment, or life insurance contract for any period * * * for which the investments made by such account are not, in accordance with regulations prescribed by the Secretary, adequately diversified." Sec. 817(h)(1). Under these regulations, a separate account is "adequately diversified" if no more than 55% of the total value is represented by any one investment; no more than 70% of the total value is represented by any two investments; no more than 80% of the total value is represented by any three investments; and no more than 90% of the total value is represented by any four investments. Sec. 1.817–5(b)(1), Income Tax Regs. The separate accounts underlying the Policies invested in dozens of startup companies in which petitioner was interested. Respondent does not contend that the separate accounts fail the section 817(h) asset-diversification requirements.

## III. *The "Investor Control" Doctrine*

### A. *Background*

The preceding discussion assumes that the insurance company owns the investment assets in the separate account. The "investor control" doctrine posits that, if the policyholder's incidents of ownership over those assets become sufficiently capacious and comprehensive, he rather than the insurance company will be deemed to be the true "owner" of those assets for Federal income tax purposes. In that event, a major benefit of the insurance/annuity structure—the deferral or elimination of tax on the "inside buildup"—will be

---

[9] Under section 7702(a), a contract is considered to be "life insurance" for Federal income tax purposes only if it meets certain tests. *See infra* pp. 371–373. Respondent does not contend that the Policies fail any of the section 7702(a) requirements.

lost, and the investor will be taxed currently on investment income as it is realized.

The "investor control" doctrine has its roots in Supreme Court jurisprudence dating to the early days of the Federal income tax. Section 1 imposes a tax on the taxable income "of" every individual. Construing the predecessor provision of the Revenue Act of 1926, ch. 27, 44 Stat. 9, the Court stated in *Poe v. Seaborn*, 282 U.S. 101, 109 (1930): "The use of the word 'of' denotes ownership." The principle thus became early established that, "in the general application of the revenue acts, the tax liability attaches to ownership." *Blair v. Commissioner*, 300 U.S. 5, 12 (1937). And "ownership" for Federal tax purposes, as the Court stated in *Griffiths v. Helvering*, 308 U.S. 355, 357–358 (1939), means ownership in a real, substantial sense:

> We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss v. Bowers*, 281 U.S. 376, 378 (1930). And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. * * *

In *Corliss*, 281 U.S. at 377, the taxpayer transferred assets to a trust, directing the trustee to pay the income to his wife for life, but reserving the power to modify or revoke the trust at any time. In an opinion by Justice Holmes, the Court held the taxpayer taxable on the trust income even though he did not receive the income or hold title to the assets that generated it. The Court reasoned: "The income that is subject to a man's unfettered command and that he is free to enjoy at his own opinion may be taxed to him as his income, whether he sees fit to enjoy it or not." *Id.* at 378.

In *Helvering v. Clifford*, 309 U.S. 331 (1940), the taxpayer contributed securities to a trust, directing himself as trustee to pay the income to his wife for a five-year period. At the end of five years, the trust was to terminate and the corpus would revert to the taxpayer. The trust instrument authorized the taxpayer to vote the shares held by the trust and to decide what securities would be bought or sold. The trust instrument also afforded him "absolute discretion" to deter-

mine whether income should be reinvested rather than paid out.

Speaking through Justice Douglas, the Court noted that the taxpayer's control over the securities remained essentially the same before and after the trust was created. "So far as * * * [the taxpayer's] dominion and control were concerned," the Court reasoned, "it seems clear that the trust did not effect any substantial change." *Id.* at 335. The Court was not concerned that the taxpayer could not "make a gift of the corpus to others" or "make loans to himself" for five years. This "dilution in his control," in the Court's view, was "insignificant and immaterial, since control over investment remained." *Ibid.* The Court's conclusion that the taxpayer effectively retained the attributes of an owner, and should be treated as the owner of the trust assets for Federal tax purposes, was based on "all considerations and circumstances" in the case. *Id.* at 336. [10]

Drawing on the principles of these and similar cases, the IRS developed the "investor control" doctrine in a series of revenue rulings beginning in 1977. On the basis of 38 years of consistent rulings in this area, respondent urges that his position deserves deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). [11] We are not bound by revenue rulings; under *Skidmore*, the weight we afford them depends

_____

[10] Appellate decisions following these cases are well illustrated by *N. Trust Co. v. United States*, 193 F.2d 127 (7th Cir. 1951). The taxpayer purchased shares of stock, which were placed in escrow with a trust company until he made payment in full. The taxpayer directed how to vote the escrowed shares, and any dividends paid reduced the balance due the seller. The Court of Appeals for the Seventh Circuit held that the taxpayer was in substance the owner of the shares, even though he was not the title owner, so that the dividends paid on the escrowed stock were taxable to him. *Id.* at 131.

[11] In *United States v. Mead Corp.*, 533 U.S. 218 (2001), the Supreme Court recognized that there are various types of agency pronouncements that may be entitled to different levels of deference, and that *Skidmore* deference, the lowest level of deference, has continuing vitality under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Mead Corp.*, 533 U.S. at 234 ("*Chevron* did nothing to eliminate *Skidmore*'s holding that an agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency" (quoting *Skidmore*, 323 U.S. at 139)); *ADVO, Inc. v. Commissioner*, 141 T.C. 298, 322 n.18 (2013).

upon their persuasiveness and the consistency of the Commissioner's position over time. *See PSB Holdings, Inc. v. Commissioner*, 129 T.C. 131, 142 (2007) ("[W]e evaluate the revenue ruling under the less deferential standard enunciated in *Skidmore v. Swift & Co.*"). We thus consider the rulings at hand under the "power to persuade" standard enunciated in *Skidmore*. [12]

## B. *Evolution of the Doctrine*

In Revenue Ruling 77–85, 1977–1 C.B. 12, a taxpayer purchased an investment annuity contract from an insurance company. The initial "premium," less various charges, was deposited into a separate account held by a custodian. The custodian invested the funds in accordance with the taxpayer's directions but only in assets from an approved list. At a certain date in the future—the "annuity starting date"—the assets in the separate account would fund an annuity, which would make monthly payments to the taxpayer based on the performance of the underlying assets.

Prior to the annuity starting date, the policyholder exercised significant control over the assets in the separate account. By issuing directions to the custodian, the taxpayer had de facto power "to sell, purchase or exchange securities"; to "invest and reinvest principal and income"; to vote the shares; and to exercise "any other right or option relating to [the] assets." *Id.*, 1977–1 C.B. at 13. The taxpayer could also make "a full or partial surrender of the policy" and receive cash equal to the value of the account less applicable charges. After the annuity starting date, the taxpayer continued to exercise investment control over the account, but he could no longer surrender the policy.

The policy in Revenue Ruling 77–85 was meant to qualify as a "variable contract" based on a "segregated asset account" within the meaning of section 817(d) (then section

---

[12] Appeal of the instant case, absent stipulation to the contrary, would lie to the Court of Appeals for Ninth Circuit. *See* sec. 7482(b)(1)(A). That Court has not decided whether revenue rulings are entitled to *Chevron* or *Skidmore* deference. *See Taproot Admin. Servs., Inc. v. Commissioner*, 679 F.3d 1109, 1115 n.14 (9th Cir. 2012), *aff'g* 133 T.C. 202 (2009); *Bluetooth SIG, Inc. v. United States*, 611 F.3d 617, 622 (9th Cir. 2010). Because respondent urges only *Skidmore* deference, we need not decide how the Ninth Circuit would resolve this question.

801(g)). But for this treatment to be available, the IRS noted, "the insurance company must be the owner of the assets in the segregated accounts." *Id.*, 1977–1 C.B. at 14. The IRS concluded that the taxpayer possessed such significant incidents of ownership over those assets that he should be considered their owner for Federal tax purposes. The fact that the assets were titled in the custodian's name did not alter this analysis because, in the Commissioner's view, "[t]he setting aside of the assets in the custodial account * * * [was] basically a pledge arrangement." *Id.* at 14–15. The IRS noted:

> When property is held in escrow or trust and the income therefrom benefits, or is to be used to satisfy the legal obligations of, * * * [another] person * * * , such person is deemed to be the owner thereof, and such income is includible in that person's gross income, even though that person may never actually receive it.

On the basis of this analysis, the IRS concluded in Revenue Ruling 77–85 that "the assets in the custodial account are owned by the individual policyholder, not the insurance company." *Id.*, 1977–1 C.B. at 15. Therefore, "any interest, dividends and other income received by the custodian on securities and other assets held in the custodial accounts are includible in the gross income of the policyholder under section 61 * * * for the year in which they are received by the custodian." *Id.*

The IRS reached the same conclusion three years later where an annuity contract was supported by a separate account held by a savings and loan association. Rev. Rul. 80–274, 1980–2 C.B. 27. The funds in the separate account were "invested in a certificate of deposit for a term designated by the depositor," who had the right to "withdraw all or a portion of the cash surrender value of the contract at any time prior to the annuity starting date." *Id.*, 1980–2 C.B. at 28. The IRS concluded that the policyholder/depositor should be considered the owner of the assets because he possessed "substantial incidents of ownership in an account established by the insurance company at * * * [his] direction." *Ibid.*

Subsequent rulings address situations in which separate accounts supporting variable contracts invest, not in securities selected directly by the policyholder, but in shares of mutual funds with their own investment manager. In Rev-

enue Ruling 81–225, 1981–2 C.B. 13, the IRS considered four scenarios in which the mutual fund shares were available for purchase by the general public wholly apart from the annuity arrangement. The policyholder had the right initially to designate the fund in which the separate account would invest, and the right periodically to reallocate his investment among the specified funds.

In these four scenarios, the IRS concluded that the insurance company was "little more than a conduit between the policyholders and their mutual fund shares." *Id.*, 1981–2 C.B. at 14. Because the "policyholder's position in each of these situations [wa]s substantially identical to what his or her position would have been had the mutual fund shares been purchased directly," the IRS concluded that the policyholder had sufficient investment control to be considered the shares' owner for Federal tax purposes. *Id.* The IRS reached the opposite conclusion in the fifth scenario, where investments in the mutual fund shares were controlled by the insurance company and the fund's sole function was "to provide an investment vehicle to allow * * * [the insurance company] to meet its obligations under its annuity contracts." *Id.* Because these shares were not available to the general public but were "available only through the purchase of an annuity contract," *id.* at 13, the IRS considered the insurance company to be the true owner of these assets.[13]

In Revenue Ruling 82–54, 1982–1 C.B. 11, the segregated account underlying the variable policies comprised three funds that invested respectively in common stocks, bonds, and money-market instruments. The insurance company was the investment manager of these funds, and the funds were not available for sale to the general public. Policyholders had the right to allocate or reallocate their investments among the three funds.

---

[13] The IRS likewise treated the insurance company as the owner where the separate account invested in shares of mutual funds that were "closed" to the general public. *See* Rev. Rul. 82–55, 1982–1 C.B. 12, 13. On the other hand, the IRS treated the policyholder as the owner of a separate account supporting a variable life insurance policy where the account invested in hedge funds that were available for sale to the general public, albeit only to "qualified investors." *See* Rev. Rul. 2003–92, 2003–2 C.B. 350.

"[I]n order for the insurance company to be considered the owner of the mutual fund shares," the IRS reasoned, "control over individual investment decisions must not be in the hands of the policyholders." *Id.*, 1982–1 C.B. at 12. Under this standard, the IRS concluded that the insurance company owned the assets in the separate account:

> [T]he ability to choose among broad, general investment strategies such as stocks, bonds or money market instruments, either at the time of the initial purchase or subsequent thereto, does not constitute sufficient control over individual investment decisions so as to cause ownership of the private mutual fund shares to be attributable to the policyholders.

In Revenue Ruling 2003–91, 2003–2 C.B. 347, a life insurance company offered variable life insurance and annuity contracts. The contracts were funded by assets held in a separate account divided into 12 subaccounts. Each subaccount followed a specific investment strategy keyed to market sector or type of security (e.g., money-market, large company growth, telecommunications, international growth, or emerging markets). None of these funds was available for sale to the general public, and all of them met the asset diversification requirements of section 1.817–5(b)(1), Income Tax Regs.

The policyholder had the right to change the allocation of his premiums among subaccounts at any time and transfer funds among subaccounts. All investment decisions regarding the subaccounts, however, were made by an independent investment manager engaged by the insurance company. The IRS stated its assumptions that: (1) the policyholder "cannot select or recommend particular investments" for the subaccounts; (2) the policyholder "cannot communicate directly or indirectly with any investment officer * * * regarding the selection * * * of any specific investment or group of investments"; and (3) "[t]here is no arrangement, plan, contract, or agreement" between the policyholder and the insurance company or investment manager regarding "the investment strategy of any [s]ub-account, or the assets to be held by a particular sub-account." Rev. Rul. 2003–91, 2003–2 C.B. at 348.

In short, although the policyholder had the right to allocate funds among the subaccounts, all investment decisions regarding the particular securities to be held in each sub-

account were made by the insurance company or its investment manager "in their sole and absolute discretion." *Id.* Under these circumstances, the IRS concluded that the insurance company would be treated as owning the assets in the separate accounts for Federal income tax purposes. The IRS indicated that this ruling was intended to "present[ ] a 'safe harbor' from which taxpayers may operate." *Id.*, 2003–2 C.B. at 347.

C. *Deference*

The "investor control" doctrine posits that, if a policyholder has sufficient "incidents of ownership" over the assets in a separate account underlying a variable life insurance or annuity policy, the policyholder rather than the insurance company will be considered the owner of those assets for Federal income tax purposes. The critical "incident of ownership" that emerges from these rulings is the power to decide what specific investments will be held in the account. As the Commissioner stated in Revenue Ruling 82–54, 1982–1 C.B. at 12, "control over individual investment decisions must not be in the hands of the policyholders." Other "incidents of ownership" emerging from these rulings include the powers to vote securities in the separate account; to exercise other rights or options relative to these investments; to extract money from the account by withdrawal or otherwise; and to derive, in other ways, what the Supreme Court has termed "effective benefit" from the underlying assets. *Griffiths*, 308 U.S. at 358.

We believe that the IRS rulings enunciating these principles deserve deference. The rulings are grounded in long-settled jurisprudence holding that formalities of title must yield to a practical assessment of whether "control over investment remained," *Clifford*, 309 U.S. at 335, and that ownership for tax purposes follows "actual command over the property taxed." *N. Trust Co. v. United States*, 193 F.2d 127, 129 (7th Cir. 1951) (quoting *Griffiths*, 308 U.S. at 355–358). These revenue rulings span a 38-year period and reflect a consistent and well-considered process of development. After stating bedrock principles in Revenue Ruling 77–85, the IRS examined more complex scenarios corresponding to newer products being offered in the financial markets. The Commissioner's consideration of these scenarios appears nuanced

and reasonable, resolving particular fact patterns favorably or unfavorably to taxpayers in light of the bedrock principles initially set forth. *Cf. Sewards v. Commissioner*, 785 F.3d 1331, 1335 (9th Cir. 2015) (affording "substantial deference" to interpretation of regulations "adopted by the IRS in Revenue Rulings issued over the last 40 years"), *aff'g* 138 T.C. 320 (2012).

The "investor control" doctrine reflects a "body of experience and informed judgment" that the IRS has developed over four decades. *Skidmore*, 323 U.S. at 140; *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 299 (2008); *see Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 15-16 (2011) ("The length of time the agencies have held * * * [these views] suggests that they reflect careful consideration[.]"). As evidenced by the absence of litigation in this area during the past 30 years, these rulings have engendered stability and long-term reliance through the private ruling process and otherwise. *See Taproot Admin. Servs., Inc. v. Commissioner*, 133 T.C. 202, 212 (2009) (history of consistent private letter rulings based on published ruling favors a finding of deference under *Skidmore*), *aff'd*, 679 F.3d 1109 (9th Cir. 2012).[14] The relative expertise of the IRS in administering a complex statutory scheme and its longstanding, unchanging policy regarding these issues amply justify deference to the IRS under *Skidmore*. *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 488–492 (2004).

Our decision to afford *Skidmore* deference to these rulings is supported by the unanimous opinion of the U.S. Court of Appeals for the Eighth Circuit in *Christoffersen v. United States*, 749 F.2d 513 (8th Cir. 1985), *rev'g* 578 F. Supp. 398 (N.D. Iowa 1984). The taxpayers there purchased from a life insurance company a variable annuity policy supported by a separate account. The initial "premium," less various charges, was invested at the taxpayers' direction in a mutual fund. Prior to the annuity starting date, the taxpayers could withdraw all or part of their investment on seven days' notice, but they were limited to withdrawing cash.

---

[14] These revenue rulings have formed the basis for numerous private letter rulings. *See, e.g.*, Priv. Ltr. Rul. 201105012 (Feb. 4, 2011); Priv. Ltr. Rul. 200420017 (May 14, 2004); Priv. Ltr. Rul. 9433030 (Aug. 19, 1994); Priv. Ltr. Rul. 8820044 (May 20, 1988).

Finding that the taxpayers had "surrendered few of the rights of ownership or control over the assets of the sub-account," the Court of Appeals for the Eighth Circuit held that they were "the beneficial owners of the investment funds" even though the insurance company "maintain[ed] the shares in its name." *Christoffersen*, 749 F.2d at 515 (citing *Clifford*, 309 U.S. 331). In the court's view, "[t]he payment of annuity premiums, management fees and the limitation of withdrawals to cash, rather than shares, d[id] not reflect a lack of ownership or control." *Id.* at 515–516. Quoting *Corliss*, 281 U.S. at 378, the court reasoned that "taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed." *Christoffersen*, 749 F.2d at 515. And citing *Griffiths*, 308 U.S. at 358, the court found it immaterial that the taxpayers' command over these assets was exercised by means other than the "specific retention of legal title." *Christoffersen*, 749 F.2d at 515. The court accordingly ruled that the "Christoffersens, and not * * * [the insurance company], own the assets of the sub-account." *Id.* at 516.

The only other case that has considered these matters is the District Court opinion in *Inv. Annuity, Inc. v. Blumenthal*, 442 F. Supp. 681 (D.D.C. 1977), *rev'd*, 609 F.2d 1 (D.C. Cir. 1979). The District Court held Revenue Ruling 77–85 invalid, but its opinion has no precedential force. It was reversed because, under the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act, the District Court lacked jurisdiction to consider the case ab initio. *See Inv. Annuity, Inc.*, 609 F.2d at 10 (remanding with instructions "to dismiss the complaint for lack of jurisdiction").

In any event, we agree with the Eighth Circuit's assessment in *Christoffersen*, 749 F.2d at 514: "[W]e cannot endorse the approach of the district court in the *Investment Annuity* case." The District Court, ruling in 1977, was troubled by what it regarded as the novelty of the position the IRS enunciated in Revenue Ruling 77–85. As of today, the Commissioner has enunciated that position consistently for 38 years. The District Court appeared to believe that Revenue Ruling 77–85 had been undermined by an IRS private letter ruling, erroneously issued a few months later, that was inconsistent with the published ruling. *See* Priv. Ltr. Rul. 7747111 (Aug. 29, 1977). This private letter ruling was revoked as soon as

this error came to the Commissioner's attention. *See* Priv. Ltr. Rul. 7805020 (Sept. 13, 1977). For these reasons, and because the District Court gave insufficient weight to relevant Supreme Court precedent, we find its opinion unpersuasive.

In sum, we conclude that the IRS revenue rulings enunciating the "investor control" doctrine are entitled to weight under *Skidmore*. Over four decades, they have reasonably applied well-settled principles of Supreme Court jurisprudence to a complex area of taxation. In any event, the legal framework urged by respondent is consistent with prior case law, and we would adopt it regardless of deference.

### D. *Ownership of the Separate Account Assets*

The investments in the separate accounts were titled to the 1999 Fund, Boiler Riffle, Philtap, and other special-purpose entities owned by Lighthouse but pledged to the Policies. Lighthouse, rather than petitioner, thus nominally owned these assets during the tax years in issue. Respondent contends that petitioner, under the "investor control" doctrine, should nevertheless be treated as their owner for Federal income tax purposes. We agree.

As drafted, the Policies allowed the policyholder to submit only "general investment objectives and guidelines" to the Investment Manager, who was supposed to build a portfolio within those parameters by selecting individual securities for purchase or sale. We need not decide whether Lighthouse would be considered the owner of the separate account assets if the parties to the arrangement had meticulously complied with these strictures. They did not.

In determining whether petitioner owned the assets underlying the Policies, we consider whether he retained significant incidents of ownership. In making this assessment, "[t]echnical considerations, niceties of the law * * *, or the legal paraphernalia which inventive genius may construct as a refuge from surtaxes should not obscure the basic issue." *Clifford*, 309 U.S. at 334. We focus instead on the actual level of "control over investment" that petitioner exercised. *Id.* at 335.

The determination whether a taxpayer has retained significant incidents of ownership over assets is made on a case-by-case basis, taking into account all the relevant facts and cir-

cumstances. *See Clifford*, 309 U.S. at 336. The core "incident of ownership" is the power to select investment assets by directing the purchase, sale, and exchange of particular securities. Other "incidents of ownership" include the power to vote securities and exercise other rights relative to those investments; the power to extract money from the account by withdrawal or other means; and the power to derive, in other ways, what the Supreme Court has termed "effective benefit" from the underlying assets. *Griffiths*, 308 U.S. at 358. Petitioner enjoyed all of these powers.

1. *Power To Direct Investments*. Petitioner enjoyed the unfettered ability to select investments for the separate accounts by directing the Investment Manager to buy, sell, and exchange securities and other assets in which petitioner wished to invest. Although the Policies purported to give the Investment Manager complete discretion to select investments, this restriction meant nothing in practice. We assess the true nature of the agreement by looking to its substance, as evidenced by the parties' actual conduct. *See Gregory v. Helvering*, 293 U.S. 465, 469 (1935); *Sandvall v. Commissioner*, 898 F.2d 455, 458 (5th Cir. 1990), *aff'g* T.C. Memo. 1989–189 *and* T.C. Memo. 1989–56. In reality, the Investment Manager selected no investments but acted merely as a rubber stamp for petitioner's "recommendations," which we find to have been equivalent to directives.

It is no coincidence that virtually every security Boiler Riffle held (apart from certain brokerage funds) was issued by a startup company in which petitioner had a personal financial interest. Petitioner sat on the boards of most of these companies, and he invested in each of them through his personal accounts, through IRAs, and through private-equity funds that he managed. He admitted that Boiler Riffle could not have obtained access to any of these investment opportunities except through him.

It is likewise no coincidence that every investment Boiler Riffle made was an investment that petitioner had "recommended." The Investment Manager took no independent initiative and considered no investments other than those petitioner proposed. The record overwhelmingly demonstrates that petitioner directed what investments Boiler Riffle should make, when Boiler Riffle should make them, and how much Boiler Riffle should invest.

Although nearly 100% of the investments in the separate accounts consisted of nonpublicly traded securities, the record contains no documentation to establish that Lighthouse or the Investment Manager engaged in independent research or meaningful due diligence with respect to any of petitioner's investment directives. Lighthouse exercised barebones "know your customer" review and occasionally requested organizational documents. But these activities were undertaken to safeguard Lighthouse's reputation, not to vet petitioner's "recommendations" from an investment standpoint.

It was not uncommon for petitioner to negotiate a deal directly with a third party, then "recommend" that the Investment Manager implement the deal he had already negotiated. Through directives to the Investment Manager, petitioner invested in startup companies in which he was interested; lent money to these ventures; sold securities from his personal account to the Policies' separate accounts; purchased securities in later rounds of financing; and assigned to Boiler Riffle rights to purchase shares that he would otherwise have purchased himself. Without fail, the Investment Manager placed its seal of approval on each transaction.

Two deals that petitioner negotiated himself exemplify the parties' modus operandi. Without informing the Investment Manager, petitioner began negotiations to acquire an interest in Longboard Vineyards, a financially troubled winery, with a $500,000 loan. On Mr. Lipkind's advice, petitioner organized Signature, a domestic C corporation, as the vehicle for making this loan. Mr. Lipkind reviewed the operating agreement for Longboard and worked with it to draft the promissory note and accompanying security agreement. Only after the paperwork was completed did Mr. Lipkind notify the Investment Manager, with instructions to "get this thing done." Within days Boiler Riffle lent Signature $450,000, which enabled Signature to lend Longboard $500,000 as petitioner wished.

There is no evidence that the Investment Manager performed any due diligence for this transaction. Petitioner was thus able to negotiate a complex deal with a financially troubled winery, extract money from Boiler Riffle for the benefit of an entity he owned, and have the security for the resulting

promissory note be subordinated to a bank loan that Longboard was having trouble paying, all without the Investment Manager's raising a whisper. As if that were not enough, petitioner proceeded to extract another $180,000 from Boiler Riffle via loans to Signature. The first $100,000 covered a second cash infusion for the winery. An email from Ms. Chang explains the other loan: "Jeff needs to borrow from Boiler Riffle $80,000 as soon as possible for a deposit on the Canada Maximas lodge, to be purchased through Wild Goose Investments."

Petitioner also wanted to acquire an interest in Post Ranch, which was developing a luxury property in Big Sur. He initially planned to make a $250,000 investment through his IRA, but decided it was "not a wise use of onshore dollars at this time given existing capital commitments and the bank's liquidity requirements." As Ms. Chang explained, petitioner was therefore "looking towards Boiler Riffle" for the funds with which to invest. Mr. Lipkind advised petitioner that a prudent investor would not make this investment, but petitioner insisted on going ahead anyway. The Investment Manager raised no question about this risky business. And Lighthouse agreed to create Philtap, a new special-purpose entity, for the sole purpose of implementing petitioner's wishes. The Post Ranch and Longboard deals vividly display petitioner's unfettered control over the investments in the separate accounts.

Petitioner testified as to his belief that the Investment Manager performed "an appropriate level of due diligence." He cites no record evidence to support this proposition, and we did not find his testimony credible. Employees of the Investment Manager would be in the best position to explain what due diligence and investment research they performed in exchange for their $1,000 annual fee. Petitioner's failure to call them as witnesses creates an inference that their testimony would not have assisted his position. *See Am. Police & Fire Found., Inc. v. Commissioner*, 81 T.C. 699, 705 (1983) (citing *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), *aff'd*, 162 F.2d 513 (10th Cir. 1947)). [15]

_____
[15] Mr. Walker, outside general counsel for Lighthouse, testified that
Continued

Among the hundreds of investments that the separate accounts made, petitioner cites only three occasions on which the Investment Manager supposedly declined to follow his recommendations. With respect to two of these investments— a Lehman Brothers fund and Milphworld—the record shows precisely the opposite. Boiler Riffle invested more than $1 million in the Lehman Brothers CIP Fund after Mr. Lipkind expressed the desire to "splice this investment into an appropriate place in Jeff's universe." Boiler Riffle invested in Milphworld by purchasing from petitioner six Milphworld promissory notes with an aggregate face value of $186,600. And while Lighthouse initially discerned a "reputational risk" regarding Safeview, it was petitioner, not the Investment Manager, who put this investment on a temporary hold. There is no evidence that the Investment Manager ever refused to implement one of petitioner's "recommendations."

In sum, petitioner actively managed the assets in the separate accounts by directing the Investment Manager (through his agents) to buy, sell, and exchange securities and other property as he wished. These facts strongly support a finding that he retained significant incidents of ownership over those assets. *See Clifford*, 309 U.S. at 335 (finding lack of absolute control immaterial "since control over investment remained"); Rev. Rul. 77–85, 1977–1 C.B. at 14 (policyholder possesses investment control when he "retains the power to direct the custodian to sell, purchase or exchange securities, or other assets held in the custodial account").

2. *Power To Vote Shares and Exercise Other Options*. Besides directing what securities the separate accounts would buy and sell, petitioner through his agents dictated what actions Boiler Riffle would take with respect to its ongoing investments. The Investment Managers took no action without a signoff from Mr. Lipkind or Ms. Chang. With respect to routine shareholder matters, these signoffs may often have occurred by phone. As Mr. Lipkind noted to petitioner: "We have relied primarily on telephone communications, not written paper trails (you recall our 'owner con-

---

Lighthouse did not conduct due diligence regarding investments, but that the "Investment Managers would." Mr. Walker had no personal knowledge of the Investment Manager's daily activities, and we found his testimony vague and unhelpful.

trol' conversations)." But examples from the email traffic display a revealing tip of the iceberg.

Petitioner repeatedly directed what actions Boiler Riffle should take in its capacity as a shareholder of the startup companies in which he was interested. He directed how Boiler Riffle should vote concerning an amendment to Lignup's certificate of incorporation and participation in a second financing round. With respect to Quintana Energy and Lehman Brothers, he directed how Boiler Riffle should respond to capital calls. With respect to Accept Software, he directed whether Boiler Riffle should participate in a bridge financing. With respect to PTRx, he directed whether Boiler Riffle should take its pro-rata share of a series D financing. With respect to Techtribenetworks, he directed whether Boiler Riffle should convert its promissory notes to equity. And with respect to Lignup, he directed whether Boiler Riffle would exercise pro-rata rights that he had assigned to it. These facts support a finding that petitioner retained significant incidents of ownership over the separate account assets. *See Clifford*, 309 U.S. at 332, 335 (power to vote shares was a significant incident of ownership); Rev. Rul. 77–85, 1977–1 C.B. at 13–14 (significant incidents of ownership included powers to vote shares and exercise "any other right or option relating to [the] assets").

3. *Power To Extract Cash*. Petitioner had numerous ways to extract cash from the separate accounts, beginning with the traditional mechanisms of life insurance policies. Each Policy permitted the policyholder to assign it; to use it as collateral for a loan; to borrow against it; and to surrender it. Given how the Policies were constructed, however, the amount petitioner could extract by surrender or policy loan was limited to "premiums paid." Because the investments petitioner selected performed very well, no "premiums" had to be paid after 2000; thereafter, ongoing mortality/administrative charges were defrayed by debiting the separate accounts. Thus, even though the assets in the separate accounts were worth $12.3 million by 2007, the amount of cash petitioner could extract by surrender or policy loan was capped at $735,046, the initial premiums paid during 1999 and 2000.

Petitioner urges that this restriction distinguishes the instant case from *Christoffersen*, where the policyholder,

prior to the annuity starting date, could withdraw the full value of the account on seven days notice. We need not decide whether the type of restriction to which petitioner and Lighthouse agreed, if it meaningfully limited the policy-holder's ability to extract cash, would be sufficient to render an insurance company the owner of assets in a segregated account. On the facts here, this restriction was trivial. Petitioner was able to extract, and did extract, cash from the separate accounts without any need to resort to policy loans.

One method was by selling assets to the separate accounts. Shortly after the Policies were initiated, petitioner sold shares of three startup companies to the 1999 Fund for $2,240,000. Through these transactions, petitioner was able to derive liquidity from assets that might otherwise have been difficult to sell.

Petitioner extracted cash from the separate accounts in numerous other ways. In November 2006 he extracted $450,000 from Boiler Riffle by causing it to lend that amount to Signature, his C corporation, for an investment he wished to make in Longboard Vineyards. In 2006 petitioner extracted $50,000 from Boiler Riffle by causing it to purchase from him a Techtribenetworks promissory note. In February 2007 he extracted an additional $186,600 from Boiler Riffle by causing it purchase from him six Milphworld promissory notes. In early 2007 he extracted $200,000 from Boiler Riffle by causing it to lend that sum to Techtribenetworks, which enabled that company to repay its $200,000 promissory note to him. In September 2007 he extracted $100,000 from Boiler Riffle for a second cash infusion through Signature to Longboard. And in fall 2007 he extracted $80,000 from Boiler Riffle to cover a deposit he wished to make on a Canadian hunting lodge.

Within the space of 12 months petitioner thus extracted from Boiler Riffle more than $1 million in cash for personal use. There is nothing in the record to suggest that he could not have extracted more if he had wished. Given his ability to withdraw cash at will, he had no need to surrender the Policies or use policy loans to extract cash. The fact that these latter mechanisms were capped at $735,046 is thus immaterial.

As the Supreme Court emphasized in *Clifford*, 309 U.S. at 335, a taxpayer need not have absolute control over invest-

ment assets to be deemed their owner. The taxpayer there could not "make a gift of the corpus to others" or "make loans to himself" for five years. But the Court found this "dilution in his control [to be] insignificant and immaterial, since control over investment remained." Petitioner's ability to withdraw cash at will from the separate accounts supports a finding that he retained significant incidents of ownership.

4. *Power To Derive Other Benefits.* Petitioner used Boiler Riffle to finance investments that may have been a source of personal pleasure, including a winery, a Big Sur resort, and a Canadian hunting lodge. More tangible benefits flowed from the fact that the investments in the separate accounts mirrored or complemented the investments in his own personal portfolio and the portfolios of the private-equity funds he managed. Petitioner regularly used the separate accounts synergistically to bolster his other positions.

After making an early stage investment, petitioner sought to find new investors for his startup ventures, aiming to enhance their prospects and move them closer to a "liquidity event." Boiler Riffle provided a readily available source of new investment funds. Petitioner often made personal financial commitments to these fledgling ventures, then had Boiler Riffle discharge those commitments on his behalf. When petitioner lacked the desire (or liquidity) to exercise pro-rata offering rights on his own shares, he assigned those rights to Boiler Riffle for exercise, thus avoiding dilution in his overall position. Boiler Riffle sometimes provided the critical missing piece of the puzzle, as when petitioner structured a $1.2 million financing for JackNyfe and needed Boiler Riffle "to be on point for the first $400,000." In all these ways, petitioner derived "effective benefit" from the separate accounts. *See Griffiths*, 308 U.S. at 358.

"[W]here the head of the household has income in excess of normal needs, it may well make but little difference to him (except income-tax-wise) where portions of that income are routed—so long as it stays in the family group." *Clifford*, 309 U.S. at 336. Petitioner used Boiler Riffle as a private investment account through which he actively managed a portion of his family's securities portfolio. Formalities aside, he maintained essentially the same rights of ownership over those assets, apart from current receipt of income, that he would have possessed had he chosen to title the assets in his own

name. [16] Since petitioner owned the separate account assets for Federal income tax purposes, all dividends, interest, capital gains, and other income received by Boiler Riffle during the tax years in issue were includible in petitioner's gross income under section 61. [17]

E. *Petitioner's Counterarguments*

1. *"Constructive Receipt."* Petitioner contends that he may not be taxed on the income realized by Boiler Riffle during 2006–2007 because he was not in "constructive receipt" of this income. The "constructive receipt" doctrine prevents cash basis taxpayers from manipulating the annual accounting principle by artificially deferring receipt of income to a later tax year. *See generally* Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, para. 105.3.3, at 105–61 (3d ed. 2012). Under this doctrine, "[i]ncome although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time." Sec. 1.451–2(a), Income Tax Regs. "[I]ncome is not constructively received," however, "if the taxpayer's control over its receipt is subject to substantial limitations or restric-

---

[16] Petitioner contends that his position differed in one respect from that of an actual owner: Because the death benefit could be paid in cash rather than in kind, Lighthouse conceivably could keep, rather than distribute to him, the stock of the startup companies he caused it to buy. But the Policies provided that Lighthouse would pay the death benefit "in cash to the extent of liquid assets and in kind to the extent of illiquid assets." Since the shares held by the separate accounts were not publicly traded, they were presumably illiquid; the Policies thus explicitly anticipated that the death benefit would to this extent be paid in kind. Although Lighthouse nominally had discretion to reject in-kind payment, it rubber-stamped all of petitioner's other "recommendations." There is no reason to believe it would countermand his preference as to the form of the death benefit. In any event, the Eighth Circuit in *Christoffersen*, 749 F.2d at 516, held that the "limitation of withdrawals to cash, rather than shares, d[id] not reflect a lack of ownership or control" by the policyholders over the mutual fund shares in the segregated account.

[17] Petitioner is the tax owner of the underlying assets even though the Policies are nominally owned by the Trusts. If the Trusts were deemed to be the owners of the underlying assets, it appears that their income would be attributable to petitioner under the grantor trust rules. *See* secs. 671, 677, 679.

tions." *Ibid.* Petitioner contends that he could enjoy actual receipt of Boiler Riffle's income only by surrendering the Policies for their (relatively puny) cash surrender value of $735,046. In his view this constituted a "substantial limitation or restriction" that precludes constructive receipt.

Although the Eighth Circuit in *Christoffersen*, 749 F.2d at 516, briefly mentioned the "doctrine of constructive receipt," that principle has no necessary application here. "As summarized by a much-quoted metaphor, constructive receipt means that 'a taxpayer may not deliberately turn his back upon income and thus select the year for which he will report it.'" Bittker & Lokken, *supra*, at 105–62 (quoting *Hamilton Nat'l Bank v. Commissioner*, 29 B.T.A. 63, 67 (1933)). The "investor control" doctrine addresses a different problem, and a finding of "constructive receipt" is not a prerequisite to its application.

It is undisputed that the owner of the separate account assets during 2006–2007 actually received the income at issue. The question we must decide is whether petitioner or Lighthouse was that "owner." If petitioner was the true owner, he is treated as having actually received what the separate accounts actually received; resort to "constructive receipt" is not necessary. The taxpayer in *Clifford*, 309 U.S. at 355, could not access the trust income for five years, yet the Supreme Court held that he nevertheless owned the assets titled to the trust. We reach the same conclusion here. [18]

2. *Application to Life Insurance*. Petitioner contends that the "investor control" doctrine, if it applies to anything, should not be applied to life insurance contracts. As he points out, Revenue Ruling 77–85 and its immediate successors addressed segregated asset accounts supporting variable annuity contracts. In 2003 the Commissioner applied the same principles to segregated asset accounts supporting variable life insurance contracts. *See* Rev. Rul. 2003–91; Rev. Rul. 2003–92. Citing *Skidmore*, 323 U.S. at 140, petitioner

---

[18] In any event, we reject petitioner's premise that the $735,046 limitation on cash surrender value constituted a "substantial limitation[ ] or restriction[ ]," sec. 1.451–2(a), Income Tax Regs., that would preclude constructive receipt. As noted previously, petitioner was able to withdraw unlimited amounts of cash from the separate accounts in other ways. *See supra* pp. 365–367.

contends that the latter two rulings "are not entitled to deference as they are not 'thoroughly considered' * * * as to the application of investor control to life insurance."

We disagree. The statutory text fully supports the Commissioner's position that variable life insurance and variable annuities should be treated similarly in this (and in other) respects. As pertinent here, section 817(d)(2) defines a "variable contract" as a contract that is supported by a segregated asset account and that "(A) provides for the payment of annuities [or] (B) is a life insurance contract." If "investor control" principles apply to the former, they would seem to apply to the latter by a parity of reasoning.

Petitioner contends that fundamental differences exist between annuity and insurance contracts because, under the latter, "the insurance company has assumed a significant obligation to pay a substantial death benefit." In petitioner's view, the "investor control" doctrine should apply only where the policyholder occupies essentially the same position that he would have occupied if he had purchased the assets in the separate account directly. Here, petitioner says that his position differs because Lighthouse's obligation to pay the minimum death benefit "substantially shifts the risks between the parties."

The existence of an insurance risk, standing alone, does not make Lighthouse the owner of the separate account assets for Federal income tax purposes. Lighthouse agreed to assume the mortality risk in exchange for premiums that it (or its reinsurer, Hannover Re) actuarially determined to be commensurate with this risk. After 2000 these premiums were replaced by mortality and administrative charges debited to the separate accounts. Unless the Trusts continued to pay the actuarially determined mortality charges, directly via premiums or indirectly via debits to the separate accounts, the Policies would have lapsed and Lighthouse would have had no more insurance risk.

During the tax years in issue the insurance risk borne by Lighthouse was almost fully reinsured with Hannover Re and was actually quite small. As of yearend 2006 and 2007, the values of the assets in the separate accounts exceeded the Policies' minimum death benefit by at least $1.7 million and $6.8 million, respectively. In any event, whatever mortality risk existed was fully compensated by mortality risk

charges ($12,327 for the years in issue) paid directly or indirectly by the policyholder. Under these circumstances, the insurer's obligation to pay a minimum death benefit does not tell us who owns the separate account assets, any more than the insurer's obligation to pay an annuity benefit determined who owned the separate account assets in Revenue Ruling 77–85. To the extent the "investor control" doctrine seeks to limit misuse of tax-favored investment assets, there is no good reason to limit its application to annuities. In the case of both annuities and insurance contracts, ownership is determined by which party has "significant incidents of ownership" over the underlying assets. Here that party was petitioner.

3. *Section 7702*. In 1984 Congress created a statutory definition of the term "life insurance contract" for Federal income tax purposes. Under section 7702(a), a policy will be treated as a "life insurance contract" only if it satisfies either the "cash value accumulation" test or both the "guideline premium" test and the "cash value corridor" test. These tests require complex calculations involving the relationships among premium levels, mortality charges, interest rates, death benefits, and other factors. Respondent does not contend that the Policies fail these tests or that they otherwise fail to qualify as "life insurance contracts" within the meaning of section 7702(a).

After enacting section 7702 Congress continued to examine the use of insurance contracts as investment vehicles. This led to the 1988 enactment of section 7702A, which defines a "modified endowment contract." Congress concurrently directed the Secretary of the Treasury to study "the effectiveness of the revised tax treatment of life insurance and annuity products in preventing the sale of life insurance primarily for investment purposes." Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100–647, sec. 5014(a), 102 Stat. at 3666; *see* H.R. Conf. Rept. No. 100–1104, 1988 U.S.C.C.A.N. 5048, 5159 (Oct. 21, 1988).

Sections 7702 and 7702A impose quantitative restrictions on life insurance and endowment contracts that have significant investment aspects. From this premise, petitioner concludes that the "investor control" doctrine cannot be applied to an insurance policy that satisfies the statutory definition. This is a variation on petitioner's preceding argument—that

the "investor control" doctrine should not be applied to life insurance.

As we explained previously, petitioner's conclusion does not follow from his premise. The fact that the Policies constitute "life insurance contracts" within the meaning of section 7702(a) does not determine, for Federal income tax purposes, who owns the separate account assets that support the Policies. The latter inquiry depends on who has substantial "incidents of ownership" over those assets. Section 7702, with its focus on quantitative relationships among premiums, interest rates, and mortality charges, does not purport to address this question.

Petitioner alternatively contends that, if the "investor control" doctrine is applied to treat him as the owner of the separate account assets, the tax results should be dictated by section 7702(g). Subsection (g) provides that, in specified circumstances, the policyholder shall be treated as receiving "the income on the contract" accrued during a particular year. The "income on the contract" is defined as "the increase in the net surrender value," plus "the cost of life insurance protection provided," minus "the premiums paid." Sec. 7702(g)(1)(B). Here, there was no increase in the Policies' cash surrender value during 2006–2007, and there were no "premiums paid." Petitioner accordingly contends that section 7702(g) limits his income inclusion to "the cost of life insurance protection provided" during the years in issue. According to petitioner, that cost would be $12,327, the mortality charges paid by the separate accounts during 2006–2007.

Petitioner's argument fails at the threshold. Section 7702(g) dictates the annual income inclusion for a policyholder "[i]f at any time any contract which is a life insurance contract under the applicable law does not meet the definition of life insurance contract under subsection (a)." Both parties agree that the Policies meet the definition of "life insurance contract" in section 7702(a). Given the statute's express terms, section 7702(g) is thus inapplicable.

Under the "investor control" doctrine, the separate account assets are treated for tax purposes as being owned by the policyholder, not by the insurance company. Consistently with this premise, Revenue Ruling 77–85 and its successors uniformly treat the policyholder as taxable on the "inside

buildup," that is, on the dividends, interest, capital gains, and other income realized on those assets annually. It would be illogical to find that petitioner owns the underlying assets, then tax the income earned on those assets as if they were owned by the insurance company. Petitioner's reliance on section 7702(g) is accordingly misplaced.

4. *Section 817(h)*. In 1984 Congress amended the Code to include section 817(h), captioned "Treatment of Certain Nondiversfied Contracts." It provides that a variable contract based on a separate account "shall not be treated as an annuity, endowment, or life insurance contract for any period * * * for which the investments made by such account are not, in accordance with regulations prescribed by the Secretary, adequately diversified." *Id.* In authorizing the Department of the Treasury to prescribe diversification standards, Congress stated its intention that

> the standards [should] be designed to deny annuity or life insurance treatment for investments that are publicly available to investors and investments which are made, in effect, at the direction of the investor. Thus, annuity or life insurance treatment would be denied to variable contracts (1) that are equivalent to investments in one or a relatively small number of particular assets (e.g., stocks, bonds, or certificates of deposits of a single issuer); (2) that invest in one or a relatively small number of publicly available mutual funds; (3) that invest in one or a relatively small number of specific properties (whether real or personal); or (4) that invest in a nondiversified pool of mortgage type investments. * * * [H.R. Conf. Rept. No. 98–861, at 1055 (1984), 1984–3 C.B. (Vol. 2) 1, 309.]

Citing this language, petitioner contends that Congress intended section 817(h) to eliminate the "investor control" doctrine altogether. Petitioner's reliance is again misplaced. Congress directed that the new diversification standards should govern situations where the investments in the separate account "are made, in effect, at the direction of the investor." H.R. Conf. Rept. No. 98–861, *supra* at 1055, 1984–3 C.B. (Vol. 2) at 309. This would be true, Congress noted, where the investments, though actually selected by the insurance company, are so narrowly focused and undiversified as to be a proxy for mutual funds or other "investments that are publicly available to investors." *Ibid.*

In adopting a regulatory regime to identify situations in which investments "are made, in effect, at the direction of

the investor," Congress expressed no intention to displace the "investor control" doctrine. That doctrine identifies situations in which investments are made at the *actual direction* of the investor, such that he exercises actual control over the investment account. *See* Rev. Rul. 77–85, 1977–1 C.B. at 14 (policyholder possesses investment control when he "retains the power to direct the custodian to sell, purchase or exchange securities, or other assets held in the custodial account").[19]

Apart from one safe harbor in section 817(h)(2), Congress left the diversification requirements to be implemented through "regulations prescribed by the Secretary." Sec. 817(h)(1). The Secretary issued temporary and proposed regulations outlining diversification standards in 1986. 51 Fed. Reg. 32633 (temporary), 32664 (proposed) (Sept. 15, 1986). The preamble stated, 51 Fed. Reg. at 32633:

> The temporary regulations * * * do not address any issues other than the diversification standards[.] * * * In particular, they do not provide guidance concerning the circumstances in which investor control of the investments of a segregated asset account may cause the investor, rather than the insurance company, to be treated as the owner of the assets in the account. For example, the temporary regulations provide that in appropriate cases a segregated asset account may include multiple sub-accounts, but do not specify the extent to which policyholders may direct their investments to particular sub-accounts without being treated as owners of the underlying assets. Guidance on this and other issues will be provided in regulations or revenue rulings under section 817(d), relating to the definition of variable contract.

Final regulations concerning diversification standards were issued in 1989. T.D. 8242, 1989–1 C.B. 215; *see* sec. 1.817–5, Income Tax Regs. Since issuing those final regulations, the IRS has continued to issue both public and private rulings invoking the "investor control" doctrine to determine owner-ship of assets in segregated asset accounts. *See, e.g.*, Rev.

---

[19] As commentators have noted, the section 817(h) diversification stand-ards may supersede some aspects of the pre-1984 revenue rulings that dis-cuss publicly available investments held by segregated asset accounts. *See, e.g.*, David S. Neufeld, "The 'Keyport Ruling' and the Investor Control Rule: Might Makes Right?," 98 Tax Notes 403, 405 (2003). But Congress did not, expressly or by implication, indicate any intention that section 817(h) should displace the bedrock "investor control" principles enunciated in Revenue Ruling 77–85, which address situations where the policyholder exercises actual control over the investments in the separate accounts.

Rul. 2003–91, 2003–2 C.B. 349–350; Rev. Rul. 2003–92, 2003–2 C.B. 351–352; Priv. Ltr. Rul. 201105012 (Feb. 4, 2011); Priv. Ltr. Rul. 200420017 (May 14, 2004); Priv. Ltr. Rul. 9433030 (Aug. 19, 1994); *see also* C.C.A. 200840043 (October 3, 2008). As the Commissioner has explained: "[T]he final regulations do not provide guidance concerning the extent to which policyholders may direct the investments of a segregated asset account without being treated as the owners of the underlying assets." Priv. Ltr. Rul. 9433030. [20]

In sum, by enacting section 817(h), Congress directed the Commissioner to promulgate standards for determining when investments in a segregated asset account, though actually selected by an insurance company, "are made, in effect, at the direction of the investor." H.R. Conf. Rept. No. 98–861, *supra* at 1055, 1984–3 C.B. (Vol. 2) at 309. It would be wholly contrary to Congress' purpose to conclude that the enactment of section 817(h) disabled the Commissioner from determining, under the "investor control" doctrine, that investments in a segregated asset account are made, in actual reality, at the direction of the investor. The Secretary clearly stated, when promulgating the new diversification standards, that the "investor control" doctrine would continue to apply, and the Commissioner's public and private rulings during the ensuing 30 years confirm his view that this doctrine remains vital. Congress has certainly evidenced no disagreement with that position. [21] For all these reasons,

---

[20] In Private Letter Ruling 9433030, for example, the taxpayer sought a ruling that assets held in a separate account would be treated as owned by the insurance company and not the policyholder. The taxpayer represented that the separate accounts would be adequately diversified under section 817(h). The Commissioner then proceeded to consider whether the policyholder or the insurance company should be treated as the owner of the separate account assets under *Christoffersen*, 749 F.2d 513, Revenue Ruling 77–85, and other authorities. The Commissioner followed the same path in Revenue Rulings 2003–91 and 2003–92.

[21] Congress in one respect has expressed its disagreement with the Commissioner's implementation of section 817(h), countermanding a provision of the 1986 proposed regulations that would have deemed all Government securities to be issued by a single entity. *See* 134 Cong. Rec. 29723 (1988). Congress then revised the statute by adding section 817(h)(6), which provides that, "[i]n determining whether a segregated asset account is adequately diversified * * *, each United States Government agency or instrumentality shall be treated as a separate issuer." *See* Technical and

Continued

we conclude that the enactment of section 817(h) did not displace the bedrock "investor control" principles enunciated in Revenue Ruling 77–85.

IV. *Subsidiary Issues*

A. *Webify Stock Basis*

The bulk of the income realized by Boiler Riffle during the tax years in issue consisted of capital gain on the sale of Webify stock. IBM purchased these shares in 2006 for more than $3 million, of which $2,731,087 was paid in 2006 and $212,641 in 2007. The parties disagree as to the basis of these shares.

We have found as a fact that the basis of the Webify shares when sold was $838,575. Petitioner was unable to locate copies of wire transfers or similar documents covering the numerous transactions in which these shares were acquired. However, Butterfield Bank's financial statements for Boiler Riffle provide a consistent picture. Although Butterfield Bank did not provide robust investment management services, no one has criticized its bookkeeping or accounting. Indeed, both parties relied, in numerous respects, on the integrity of the financial statements and other documents that it prepared. In determining the long-term capital gain in 2006 and 2007 on the sale of Webify stock, therefore, the parties shall use a basis of $838,575. *See* secs. 1001, 1221.[22]

---

Miscellaneous Revenue Act of 1988, Pub. L. No. 100–647, sec. 6080, 102 Stat. at 3710 (Nov. 10, 1988). Since Congress has revisited section 817(h) to revise one aspect of the Commissioner's implementation of the diversification standards, the fact that it has left undisturbed the Commissioner's continuing invocation of "investor control" principles is not without significance. Courts ordinarily are slow to attribute significance to Congress' failure to act on particular legislation, *Aaron v. SEC*, 446 U.S. 680, 694 n.11 (1980), but in some situations Congress' inaction may provide a "useful guide," *see Bob Jones Univ. v. United States*, 461 U.S. 574, 600–602 (1983). The latter would seem to be true here.

[22] Petitioner appears to argue that all of the basis should be allocated to payments received in 2006. If there is any disagreement on this point, the parties can resolve it as part of the Rule 155 computations.

B. *Boiler Riffle Distributions*

Respondent argues that the distributions Boiler Riffle made to Lighthouse in 2006–2007 to cover the Policies' annual mortality and administrative charges should be included in petitioner's income. These payments were derived from income Boiler Riffle realized on the separate account investments. We have held that petitioner, as the owner of these investments, is taxable in full on the income they generated. If petitioner were separately taxed as the deemed beneficiary of the payments made from this income, as respondent asks us to hold, petitioner in effect would be subject to double taxation. We decline that request. [23]

V. *Accuracy-Related Penalty*

Section 6662 imposes a 20% accuracy-related penalty upon the portion of any underpayment of tax that is attributable (among other things) to a substantial understatement of income tax. *See* sec. 6662(a), (b)(2). An understatement is "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return for that year. Sec. 6662(d)(1)(A). The Commissioner bears the burden of production with respect to a section 6662 penalty. Sec. 7491(c). If respondent satisfies his burden, petitioner then bears the ultimate burden of persuasion. *See Higbee v. Commissioner*, 116 T.C. 438, 446–447 (2001).

The section 6662 penalty does not apply to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to * * * [it]." Sec. 6664(c)(1). The decision whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664–4(b)(1), Income Tax Regs. A taxpayer may be able to dem-

---

[23] As an alternative to his "investor control" position, respondent contends that the Chalk Hill Trust in effect owned Boiler Riffle, with the result that petitioner, as the owner of that grantor trust, would be taxable on Boiler Riffle's income under subpart F. *See* sec. 1.958–1(b), Income Tax Regs. (providing that a CFC owned by a foreign grantor trust is treated as owned by the grantor). Whereas we have found petitioner to be the owner of the assets in the separate accounts, Lighthouse was the owner of Boiler Riffle and other special-purpose entities it created. Because Boiler Riffle had no U.S. shareholders, the CFC rules do not apply.

onstrate reasonable cause and good faith by showing reliance on professional tax advice. Sec. 1.6664–4(c)(1), Income Tax Regs.; *see Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

"Advice" must take the form of a "communication" that sets forth the adviser's "analysis or conclusion." Sec. 1.6664–4(c)(2), Income Tax Regs. In assessing whether the taxpayer reasonably relied on advice, we consider whether the adviser was competent; whether the adviser received accurate and complete information from the taxpayer; and whether the taxpayer actually relied in good faith on the advice he was given. *Neonatology Assocs., P.A.*, 115 T.C. at 99.

Petitioner urges that he reasonably relied on Mr. Lipkind's advice. Mr. Lipkind was clearly a competent tax adviser. He is an expert in income and estate tax, and he diligently researched the relevant legal issues. He also received accurate and complete information about the Lighthouse arrangements because he set up petitioner's estate plan.

Mr. Lipkind provided petitioner with "advice." Mr. Lipkind did not himself render a written legal opinion, but he reviewed and considered written opinion letters from reputable law firms addressing the relevant issues. Three of these opinion letters specifically addressed the "investor control" doctrine; they concluded that the Lighthouse policies, as structured, would comply with U.S. tax laws and avoid application of this doctrine. By informing petitioner that he concurred in these opinions, Mr. Lipkind provided petitioner with professional tax advice on which petitioner actually relied in good faith.

We likewise conclude that petitioner's reliance was "reasonable." Petitioner made multiple filings with the IRS setting forth details about the Trusts and Lighthouse, including gift tax returns filed for 1999 and 2003 and Form 3520 filed when the Policies were transferred to an offshore trust. Petitioner did not attempt to hide his estate plan from the IRS. This supports his testimony that he believed this strategy would successfully withstand IRS scrutiny, as Mr. Lipkind had advised.

The revenue rulings discussing the "investor control" doctrine adopted consistent positions and ultimately set forth a "safe harbor." Rev. Rul. 2003–91, 2003–2 C.B. at 347. However, the outer limits of the doctrine were not definitively

marked when Mr. Lipkind rendered his advice in 1998. Whether an investor exercises impermissible "control" presents a factual issue, and Mr. Lipkind dictated the "Lipkind protocol" as a mechanism for keeping petitioner on the supposed right side of the line. Although the "Lipkind protocol" was formalistic and ultimately unsuccessful, we do not fault petitioner, who had no expertise in tax law, for following his lawyer's advice on this point. *Cf. Van Camp & Bennion v. United States*, 251 F.3d 862, 868 (9th Cir. 2001) ("Where a case is one 'of first impression with no clear authority to guide the decision makers as to the major and complex issues,' a negligence penalty is inappropriate." (quoting *Foster v. Commissioner*, 756 F.2d 1430, 1439 (9th Cir. 1985))); *Montgomery v. Commissioner*, 127 T.C. 43, 67 (2006); *Williams v. Commissioner*, 123 T.C. 144, 153–154 (2004) (reasonable cause may be found where return position involves issues that were novel as of the time that return was filed). [24]

For these reasons, we conclude that petitioner is not liable for the accuracy-related penalty for any of the years in issue.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

———

[24] We disagree with respondent's submission that Mr. Lipkind was a "promoter" upon whom petitioner could not reasonably rely. *See 106 Ltd. v. Commissioner*, 136 T.C. 67, 79–80 (2011), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012). Mr. Lipkind has maintained a continuous attorney-client relationship with petitioner for more than a dozen years. Mr. Lipkind had no stake in petitioner's estate plan apart from his normal hourly rate, and Mr. Lipkind received no remuneration or other benefit from Lighthouse, Boiler Riffle, or the Investment Manager. Mr. Lipkind did not plan the private placement life insurance structure, but only advised petitioner to purchase such a policy after thoroughly vetting Lighthouse, an unrelated insurance company. The evidence established that Mr. Lipkind recommended the Lighthouse estate plan only to his wife, to petitioner, and to a small number of other clients.